1. Official assessment for ad valorem taxation of property (such as shares of stock in a private corporation), although at a less valuation than its true value, is violative of the equal-protection clause of the 14th amendment to the Federal constitution where the administrative *Page 782 
officers intentionally and systematically assess other similar property at a substantially lower value.
(a) In the instant case the value of the property of the plaintiff was assessed at fifty per cent. of its true value, while like property of other persons was assessed at 15 per cent. of the true market value.
(b) The case differs on its facts from Nashville, Chattanooga 
St. Louis Railway v. Browning, 310 U.S. 362
(60 Sup. Ct. 968, 84 L. ed. 1254).
2. In Gullatt v. Slaton, 189 Ga. 758 (3), 766 (8 S.E.2d 47), it was held: "Under the rulings in Columbus Mutual Life Insurance Co. v. Gullatt, 189 Ga. 747 [8 S.E.2d 38], and Allied Mortgage Companies Inc. v. Gilbert, 189 Ga. 756
[8 S.E.2d 45], the board of arbitrators provided for in the Code, § 92-6912, are not vested with authority to determine questions of taxability, but are limited to a review and determination of values respecting the property assessed for taxation." In Gilbert v. Northwestern Mutual Life Insurance Co., 189 Ga. 766 (8 S.E.2d 43), it was held: "The proper procedure for contesting taxability of unreturned property assessed or sought to be assessed by a county board of tax-assessors is by petition in equity. The board of arbitration provided for by the Code, § 92-6912, has no authority to pass upon questions of taxability of such property.' [Citing Columbus Mutual Life Ins. Co. v. Gullatt and Guardian Life Insurance Co. of America v. Gullatt, 189 Ga. 747.] When such a board undertakes to do so, its decision on taxability is void as beyond the powers conferred by law." Held:
(a) By parity of reasoning, the limitations of power on the board of arbitrators, as expressed in the foregoing decisions, exclude power of the board of arbitrators on arbitration of tax-assessments to pass on the power of tax-assessors to assume jurisdiction to put in vogue or practice a custom to tax property at less than its true value.
(b) Such assumption of jurisdiction would involve power to pass on intricate questions of law (not intended by the statutory law relating to assessment of property, and arbitration of such assessments) altogether different from assessment of mere value to which the officers under the above-quoted decisions are limited.
(c) An award by the board of arbitrators on such question of law would be without jurisdiction of the subject-matter, and consequently void. Such award would not bar the right of the owner of the property, who had demanded arbitration, to complain in equity seeking to set aside the award and enjoin the execution based thereon, as violative of the equal-protection clause of the Federal constitution.
3. In the above-stated circumstances the fact that the aggrieved owner invoked the arbitration would not estop him from attacking the award in equity as void. A judgment of a court without jurisdiction of the subject-matter is void, and may be attacked collaterally as a mere nullity in any court by any party when it becomes material to his interest. Code, §§ 110-701, 110-709.
(a) The City of Atlanta assessed all intangible property at fifteen per cent. of the value. Deputies of Guy A. Moore, the county tax-receiver, occupied space in the city hall where they were furnished with lists of the assessments by the city. These were accepted by them at the *Page 783 
same value and transmitted to the county tax-receiver, who also received them. He likewise received returns of such intangible property at such valuation of persons residing in the county outside of the city, In this way he received ninety-nine per cent. of the tax returns on intangible property which were by him transmitted to the county board of tax-assessors, who accepted them at fifteen per cent. of their value. The board of county tax-assessors did not assess more than approximately one per cent. of the property other than that so furnished them by the tax-receiver. As to such additional property so assessed by them the assessments were on the basis of sixty per cent. of the value. It was not denied by the board of tax-assessors that they received the assessments as indicated above, and consequently there was no dispute as to the actual taxation of the vast bulk of intangible property at fifteen per cent. of the value. Therefore there was no conflict of evidence on the question of fact.
(b) The system of taxing shares of corporate stock, as mentioned above, at fifteen per cent. of its value was not objected to by the plaintiff. The objection was to taxation of his shares at fifty per cent. of their value while shares of corporate stock of other persons were intentionally and systematically taxed at fifteen per cent. of their value. The plaintiff promptly contested the assessment by demand for arbitration. At the hearing the inequality above mentioned was shown, but the award of the board nevertheless sustained the assessment. A review was sought by writ of certiorari, which the Court of Appeals finally ordered dismissed because certiorari was not an available remedy. Montgomery v. Gullatt, 62 Ga. App. 844
(10 S.E.2d 298). During the succeeding month after decision of the Court of Appeals, the instant suit in equity was instituted. In the circumstances the plaintiff was not barred by laches. On this point the case differs from Mayor c. of Savannah v. Fawcett, 186 Ga. 132 (197 S.E. 253), in which the plaintiffs were held to be barred by laches. In that case, the plaintiffs stood by for several years without complaining of the alleged practice. Here the plaintiff acted promptly after the assessment of 1937, which is the only assessment involved. While the system of assessing intangibles at fifteen per cent. of their value had been in vogue for two years, not until 1937 did the authorities discriminate against the complainant by assessing his intangibles at the higher rate of 50 per cent. of their value.
4. The judge erred in refusing an interlocutory injunction.
 No. 13563. MARCH 11, 1941. ADHERED TO ON REHEARING, MARCH 29, 1941.
The board of tax-assessors for the County of Fulton informed L. F. Montgomery by letter: "We find that you failed to return certain intangible personal property owned by you, which is subject to state, county, and school taxation. We have assessed and fixed the just and fair value of said intangible property, for taxation as provided by law, for the years and the amounts shown *Page 784 
below." Then follow lists of described shares of corporate stock and the value at which they were assessed. Montgomery, objecting to the assessment, demanded arbitration. Arbitrators were duly appointed, and made their return. One of the arbitrators dissented. An execution was issued against Montgomery for the amount found to be due by the terms of the award for the year 1937. Montgomery brought suit to enjoin collection of the tax, and to cancel the execution, on the grounds that the assessment was based upon fifty per cent. of the cash market value of the property in question, whereas the officers "customarily, systematically, and intentionally followed the practice of permitting taxpayers to return stocks and bonds, such as the intangibles herein referred to, at fifteen per cent. (15%) of value," and consequently the "effort on the part of such officials to tax petitioner upon any different basis (to wit, in this case on the basis of 50% of value) constituted an intentional and deliberate discrimination against petitioner, and is not an impartial administration of tax laws, and the same therefore is in violation of the fourteenth amendment of the constitution of the United States, article XIV, section 1 (Georgia Code, section 1-815), which is as follows: ` . . No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws." Also, that for similar reasons the said official action is violative of the due-process of law, and equal-protection, and uniformity of taxation clauses of the State constitution. Code, §§ 2-103, 2-102, 2-5001.
At the hearing testimony was introduced, substantially as follows. Guy A. Moore, tax-receiver of Fulton County, testified, that for the year 1937 intangible property such as stocks was accepted by his office at fifteen per cent. of value; that this was done with the general understanding that all tax officials agreed to it and recommended it generally; that after all the returns were accepted, they were, according to statute, turned over to the board of tax-assessors, who knew of the practice followed in accepting stocks at fifteen per cent.; and that he knew of no case where the assessors refused to approve a return where stock was accepted at fifteen per cent. J. C. Shelor testified, that he was secretary of the committee *Page 785 
which advised with the tax officials of Fulton and DeKalb Counties and the City of Atlanta about the program of accepting intangible property at fifteen per cent; that a plan was worked out with the officials to accept such property on that basis; that the practice was followed for 1935, 1936, and 1937; and that a copy of the plan was published in the Atlanta newspapers. A. S. Clay testified, that during the year 1935 or 1936, he was present at a conference with the tax-assessors of Fulton County, in their office at the court-house, and saw posted on the wall a tax notice clipped from one of the Atlanta newspapers, which stated that tax returns would be accepted on intangibles in certain percentages of the market value; and that this notice so posted was the plan to accept intangibles at fifteen per cent. W. N. Blankenship testified, that the City of Atlanta accepted stocks and intangibles of that nature for the years 1935, 1936, and 1937 at fifteen per cent. of value; that this practice was general and systematic; that the tax officials of Fulton County have employees at the city hall in a booth set aside, where these Fulton County tax officials can accept returns of taxes for the same property on which returns are made to the city; that the practice followed was that the taxpayer "would come to our office first to make city returns, and they copied the city returns, that is the valuation of the items that were returned, and they handed them to the taxpayers, and he would then hand it to the county official, who would copy down our values for the Fulton County returns. In other words, the county takes the property on the same basis as the city."
Ernest Bell, deputy tax-receiver of Fulton County, testified: Since 1935 he had occasion to maintain a desk at the city hall in Atlanta, where he accepted tax returns of Fulton County. These taxpayers made returns to the City of Atlanta, and it was his practice to be there at the city hall and accept returns simultaneously for the county. He gets the copy of what the city sends in. He takes just what the city sends in, except he takes real estate at seventy per cent. of the city figure. He did not know at what percentage of value the city accepted all stocks and bonds. He guessed it was fifteen per cent. He thought the city took them on that basis. He was instructed by Mr. Guy Moore, tax-receiver, to accept returns on the same basis that the city did. C. Homer Gullatt, one of the tax-assessors of Fulton County, testified, that his *Page 786 
office accepted the same assessment on personal property, including stocks and bonds, as the City of Atlanta took them for. The general practice was the same in 1935, 1936, and 1937. He was in favor of the plan personally, but told them he could not agree to it as an assessor. The way he justified himself in accepting the same assessment on personal property as the City of Atlanta was that he did not have any way of knowing how many stocks and bonds anybody had or any way to get such information. The assessors did not have any record of the stocks and bonds the taxpayers owned, and, if they had them for one year, whether it was the same for another year. Witness talked to Mr. L. K. Starr about this plan. There were for the last five years from 70,000 to 85,000 returns made to Fulton County each year, which include corporations and individuals. About ninety-nine per cent. of those returns are made through the office of the tax-receiver, Mr. Guy A. Moore. Witness would handle about one where Mr. Moore would handle about ninety-nine for the current year. "If the returns in Mr. Moore's office corresponded with the city returns, we made no corrections, because we did not have any information." The county tax-assessors made no corrections on county returns where they tallied with the city returns. During the years 1935, 1936, and 1937, when tax returns came from the tax-receiver to the board of tax-assessors, "we checked these returns against the returns to the city." With respect to personal property, the county tax-assessors always required the return to the county to be as much as one hundred per cent. of the return to the city. That applied to all classes of personal property. All personal property assessments made by the board in December, 1937, were figured by the board at sixty per cent. of market value. Assessments on stocks and bonds, made in the fall of 1937, were figured by the board at sixty per cent. of market value. That applies to 1935, 1936, and 1937. That is the only percentage the board has used from 1935 to date. The board of tax-assessors did not make any difference between any taxpayers, except that we did not get the property that was in the City of Atlanta. We accepted those returns, because we did not keep a card record of personal property in Atlanta, and we did not have any field book on real estate in Atlanta. We followed the City of Atlanta for that reason. In a few cases we got other information about property owned by taxpayers living in *Page 787 
Atlanta. In those cases we acted on the best information we had. We did not follow the city assessments where we found the property grossly undervalued. In those cases where we found the property grossly undervalued the board used sixty per cent. That applied to all property and to taxpayers living both in and outside of the city, where we discovered that it was not returned, or was returned but grossly undervalued. In reviewing returns and assessing property we never knowingly accepted any taxpayer's personal property or intangibles on any preferred basis, where we had the information. We had our ideas, and might have talked about some of them not being enough, but lots of them did not come to the board's attention. These returns were checked out by clerks; and if the return to the county checked with the city, the return was accepted on that basis. The city records and field books were about all the information we had in the average case. That was all the information we could get. Hundreds of these returns were corrected. We checked the 1937 returns after the county digest had closed in August. Between August and December, 1937, we did more checking and assessing than we ever did in any one year. Where property was grossly undervalued, we made additional assessments, or we settled by sending notices and working out the details. We used sixty per cent. of the market value in all cases.
Reese Perry and H. W. Gilbert, tax-assessors of Fulton County, testified: The tax-assessors did not at any time approve the act of the Citizens Committee concerning the advertisement in the newspapers in reference to accepting stocks and bonds at fifteen per cent. of the market value, nor did the board of tax-assessors authorize any person to sign or affix the signature of the members of the board to the advertisement. It was the custom of the board of county tax-assessors to assess all property subject to tax in the county on the basis of sixty per cent. of the market value of the property, and the assessors uniformly throughout the years 1935, 1936, and 1937 applied the rule of sixty per cent. of the market value. They could not say what ratio of valuation taxpayers may have used in some cases in making the returns of property for taxation, but in the performance of their official duty they had never at any time during the years mentioned knowingly departed from the uniform rule of sixty per cent. of the market value, which the tax-assessors have endeavored to apply as an equalization factor in equalizing the returns of all taxpayers in the county. *Page 788 
At interlocutory hearing, after conclusion of the evidence, the judge passed an order in part as follows: "It is considered, ordered, and adjudged that there is a conflict in the evidence. It is further considered and adjudged that the plaintiff L. F. Montgomery chose his forum, namely a board of arbitration under section 92-6912 of the Code of 1933, to fix the taxable value of his property, and the award of the arbitrators is binding on the plaintiff and can not be reviewed by this court. Wherefore the prayer for injunction is denied, and the temporary restraining order heretofore entered herein is dissolved." The plaintiff excepted.
1. In the years long passed a principle was restated thus: "Though the law itself be fair on its face and impartial in appearance, yet, if it is applied and administered by public authority with an evil eye and an unequal hand, so as practically to make unjust and illegal discriminations between persons in similar circumstances, material to their rights, the denial of equal justice is still within the prohibition of the constitution." Yick Wo. v.
Hopkins, 118 U.S. 356, 373-374, and cit. The principle has received recognition in various phases of judicial thought and application in various circumstances. In the cited instance, application of the principle was in a case where one person (a subject of China), of three hundred and ten persons restricted by the municipal ordinance in question, was complaining of discrimination in favor of eighty persons (not Chinese) who under similar conditions were unmolested and left free to enjoy the resulting enhanced trade and profits arising from their several businesses. It was held, on the principle stated, that the complaining person who had been arrested was entitled to discharge on writ of habeas corpus. Under different circumstances more closely related to the instant case the principle was applied in Sioux City Bridge Co. v. Dakota County, 260 U.S. 441, involving assessment for taxation of realty, being a species of property, or one kind of property included in the general class of property that was taxable under the State constitution and laws. It was held: "1. Intentional and arbitrary assessment of the property of one owner for taxation at its true value, in accordance with the State constitution and laws, *Page 789 
while all other like property is systematically assessed much lower, is a violation of the equal protection of the laws. 2. The owner aggrieved by this discrimination is entitled to have his assessment reduced to the common level, since by no juridical proceeding can he compel reassessment of the great mass of such property at its true value as the law required." See Phillips Petroleum Co. v. Townsend, 63 F.2d 293 (3), and cit.;Georgia Railroad Banking Co. v. Wright, 125 Ga. 589, 601,604 (54 S.E. 52); Bohler v. Callaway, 267 U.S. 479,45 Sup. Ct. 431, 69 L. ed. 745). The above quoted decision related to a case where the property was assessed at its true value, while other like property was assessed at a much lower value. It would not relieve the inequality inhibited by the constitution if the assessment first mentioned had been at less than the true value of the property, as in the instant case. If allowable, that would amount merely to a convenient means of avoiding the equal-protection clause of the Federal constitution. It is palpable that inequality results from assessment of property at a fractional per cent. of its true value as compared with assessment of other similar property at a substantially lower percentage of its true value. The principle applies to the instant case, where the assessment against the property of the plaintiff (shares of corporate stock in a private corporation) was at fifty per cent. of its true value, while like property of other persons was systematically assessed at fifteen per cent. of its true value. The discrimination would not be more patent had the assessors intentionally and systematically excluded from assessment all intangible properties except those of the complainant, but assessing his intangibles at fifty per cent. of its true value. Such administration by the officials comes within the inhibition of the equal-protection clause of the 14th amendment to the Federal constitution. The principle seems to have been recognized in Mayor c. of Savannah v. Fawcett,186 Ga. 132 (supra), and Hardin v. Reynolds, 189 Ga. 534
(6 S.E.2d 328), though not expressly ruled on in either case. The case differs on its facts from Nashville, Chattanooga St. Louis Railway v. Browning, 310 U.S. 362, 368 (60 Sup. Ct. 968,84 L.ed. 1254) distinguishing the above cited cases. As the inequality complained of in the present case relates to assessments of shares of corporate stock whereby the stocks of complainant are assessed at fifty per cent. of their true value, whereas the great mass of shares of corporate *Page 790 
stock of other persons are systematically assessed at only fifteen per cent. of the market value, the ruling in Verdery v.Summerville, 82 Ga. 138 (8 S.E. 213), supports rather than militates against the above ruling. In that case this court said: "The tax ordinance of the Village of Summerville for the year 1887, imposing a tax of one quarter of one per cent., ad valorem, upon real estate only, is void by reason of conflict with the constitution in not laying the tax ad valorem upon all property (real and personal) subject to be taxed within the territorial limits of the authority levying the tax." The assessment now in question has reference to taxation for the year 1937 under the constitution of 1877, which was before the amendment to the constitution ratified on June 8, 1937 (Code Ann. § 2-5001) authorizing the General Assembly to classify property for taxation and to adopt different rates and different methods for different classes or species of such property. This constitutional amendment and the act passed in pursuance thereof (Ga. L. Ex. Sess. 1937-38, p. 156) do not in any way apply to the instant case. The other rulings in the headnotes do not require elaboration.
Judgment reversed. All the Justices concur.