98 N.E.2d 8 (1951)
155 Ohio St. 61
STANDARD OIL CO.
v.
GLANDER, Tax Com'r et al.
No. 32060.
Supreme Court of Ohio.
March 14, 1951.
*10 McAfee, Grossman, Taplin, Hanning, Newcomer & Hazlett and Rufus S. Day, Jr., all of Cleveland, for appellant.
Herbert S. Duffy, Atty. Gen. and Donald B. Leach, Columbus, for appellee, Tax Commissioner.
MATTHIAS, Judge.
The appellant has assigned numerous errors with respect to each of the two appeals considered by the Board of Tax Appeals and which the board determined adversely to appellant. These assignments have been summarized in the brief of the appellant and will be discussed in the order therein stated.
The first questions of law presented are: Did the state of Ohio have jurisdiction, under Section 5325, General Code, to assess *11 taxes for the years 1945 and 1946 upon certain boats and barges of the company which were not in use in Ohio and the use of which in waters bordering on Ohio was insubstantial, and is such assessment violative of the Fourteenth Amendment of the Constitution of the United States?
The record discloses that in its 1945 personal property tax return the appellant listed three towboats and 31 barges at a depreciated book value of $1,017,518, and in 1946 listed boats and barges having a depreciated book value of $726,733. The Tax Commissioner on audit raised the valuation of the boats and barges for 1945 to a true value of $1,322,863 and raised the valuation for 1946 to a true value of $1,303,907. Thereafter, within time, the appellant filed its application for review and redetermination for 1945 and 1946, contending, first, that its crude oil boats and barges, which carried crude oil from various points on the Mississippi river, up the Mississippi and Ohio rivers, to points in Indiana and Kentucky, were not taxable in Ohio under Section 5325, General Code, for the reason that they were not used in Ohio and their use in waters bordering on Ohio was insubstantial and, therefore, taxation of these boats and barges by the state was violative of the due process clause of the Fourteenth Amendment of the United States Constitution.
The crude oil boats and barges involved constituted the greater part of the valuation upon which the taxes assessed were based. The remainder of the assessed value represented gasoline boats and barges engaged in transporting gasoline to various points in Ohio. These latter boats and barges are not involved in the controversy.
The contentions of the appellant were rejected in their entirety by the Tax Commissioner on review and redetermination. Upon appeal the Board of Tax Appeals held that, under Section 5325, General Code, with the exception of one small boat valued at $3,500, the oil boats and barges of the appellant were taxable in Ohio. The board announced that, being an administrative tribunal, it had no jurisdiction to decide the constitutional question presented.
The facts upon which the appellant bases its claim of want of jurisdiction of the state to levy such tax are as follows:
These crude oil boats and barges, during 1944 and 1945, were engaged in transporting oil from various points on the lower Mississippi river to Mount Vernon, Indiana, and Bromley, Kentucky. The crude oil unloaded at Mount Vernon, Indiana, was moved from that point by pipe line to various destinations, and the oil unloaded at Bromley, Kentucky, was likewise moved to the appellant's refinery at Latonia, Kentucky.
The appellant introduced evidence to show the number of miles traversed and the number of barrels of oil carried by each boat on each routing during the years 1944 and 1945. This evidence showed that the greater bulk of the operation of these boats during each year was over three routesMemphis, Tennessee, to Mount Vernon, Indiana, Memphis, Tennessee, to Bromley, Kentucky, and Baton Rouge or Gibson, Louisiana, to Bromley, Kentucky; and that of the total river-route mileage traversed by the appellant's crude oil boats and barges from the lower Mississippi river to Bromley, Kentucky, only 17½ miles was through waters bordering on the state of Ohio.
In an attempt to arrive at a percentage figure the appellant computed these activities on a basis of "barrel miles" (number of miles multiplied by number of barrels carried) and found that the percentage of barrel miles on the portion of the river bordering on Ohio was, in 1944 and 1945, 1.27 per cent of the total barrel miles. It is claimed that none of the barrel miles was actually within the state of Ohio since its border is the low water mark on the Ohio side of the river and the boats and barges were operated south of the border.
These crude oil boats and barges were registered from Cincinnati but, except for short stops for food, fuel, or minor repairs, never were docked at Cincinnati, all repairs being made at Paducah, Kentucky, St. Louis, Missouri, or some other down-river point. No cargoes were ever taken on at Cincinnati during the years 1944 and 1945.
*12 The appellant contends that, even if the company's crude oil boats and barges were constitutionally within Ohio's jurisdiction, Section 5325, General Code, should not be so construed as to authorize taxation thereof.
Section 5328, General Code, provides in part as follows: "All ships, vessels and boats, and shares and interests therein, defined in this title as `personal property,' belonging to persons residing in this state, and aircraft belonging to persons residing in this state and not used in business wholly in another state, shall be subject to taxation."
Section 5325, General Code, defines "personal property" as follows: "* * * every ship, vessel, or boat, of whatsoever name or description, used or designed to be used either exclusively or partially in navigating any of the waters within or bordering on this state, whether such ship, vessel, or boat is within the jurisdiction of this state or elsewhere, and whether it has been enrolled, registered, or licensed at a collector's office, or within a collection district within this state, or not."
The appellant contends that its boats would be taxable in Ohio only if they were "used or designed to be used exclusively or partially in navigating any waters within or bordering on this state"; that, since the boats and barges were being used exactly as "designed," the only question under the statute is whether the actual use made of the boats and barges during the years in question brought them within the provisions of the statute.
The company contends that although this statute purports to tax boats operating in waters bordering on Ohio, it should not be construed to apply to boats whose use in waters within or bordering on Ohio was insubstantial. This contention is based upon the maxim, de minimis non curat lex. The decision of the Supreme Court of the United States in the case of Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680, 66 S.Ct. 1187, 90 L.Ed. 1515, is cited in support of that contention. That case involved portal to portal pay.
Both the Tax Commissioner and the Board of Tax Appeals refused to adopt that interpretation of Section 5325, General Code. We quote from the decision of the Board of Tax Appeals:
"Section 5366, General Code, characterizes as `taxable property' all the kinds of property mentioned or referred to in the above quoted provisions of Section 5328, General Code. Section 5371, General Code, provides generally that personal property used in business shall be listed and assessed in the taxing district in which such business is carried on. This section, however, further provides as follows:
"`Ships, vessels, boats and aircraft, and shares and interests therein, shall be listed and assessed in the taxing district in which the owner resides.' Inasmuch as it appears that at all of the times here in question these boats and barges were used in part in navigating the waters of the Ohio river bordering on this state, such boats and barges as the property of the appellant, an Ohio corporation having its domicile in this state, were clearly taxable under the expressed terms of the above noted statutory provisions."
We are in accord with that statement for it clearly appears that under the facts disclosed by the record such crude oil boats and barges were not used exclusively in another state and, therefore, came within the provisions of Section 5328, General Code.
Since these crude oil boats and barges came within the provisions of Sections 5325 and 5328, General Code, the contention of the appellant that the boats and barges were not within the jurisdiction of the state of Ohio for tax purposes becomes pertinent. The appellant contends that tangible personal property is not constitutionally subject to multiple taxation and, therefore, is taxable only by the state in which it has its situs. Further, appellant contends that under the decision of the Supreme Court of the United States in the recent case of Ott, Comm'r v. Mississippi Valley Barge Line Co., 336 U.S. 169, 69 S.Ct. 432, 93 L.Ed. 585, river boats are subject to taxation only in accordance with *13 the rule of proportionate taxation heretofore applied in the taxation of the rolling stock of railroads. This contention requires an examination of that case for if it is applicable to the boats and barges owned by the appellant, there is now no provision in the laws of Ohio under which they may be taxed.
The facts in the Ott case, supra, are set forth in the opinion, as follows:
"Appellees are foreign corporations which transport freight in interstate commerce up and down the Mississippi and Ohio Rivers under certificates of public convenience and necessity issued by the Interstate Commerce Commission. Each has an office or agent in Louisiana but its principal place of business is elsewhere. The barges and towboats which they use in this commerce are enrolled at ports outside Louisiana; but they are not taxed by the states of incorporation.
"In the trips to Louisiana a tugboat brings a line of barges to New Orleans where the barges are left for unloading and reloading. Then the tugboat picks up loaded barges for return trips to ports outside that state. There is no fixed schedule for movement of the barges. But the turnarounds are accomplished as quickly as possible with the result that the vessels are within Louisiana for such comparatively short periods of time as are required to discharge and take on cargo and to make necessary and temporary repairs.
"Louisiana and the City of New Orleans levied ad valorem taxes under assessments based on the ratio between the total number of miles of appellees' lines in Louisiana and the total number of miles of the entire line. The taxes were paid under protest and various suits, which have been consolidated, were instituted in the District Court by reason of diversity of citizenship for their return, the contention being that the taxes violated the Due Process Clause of the Fourteenth Amendment and the Commerce Clause."
Following the citation and analysis of the cases wherein the court had evolved the rule that vessels are taxable solely at the domicile of the owners, save where they had acquired an actual situs elsewhere, the Supreme Court of the United States concluded as follows:
"We see no practical difference so far as either the Due Process Clause or the Commerce Clause is concerned whether it is vessels or railroad cars that are moving in interstate commerce. The problem under the Commerce Clause is to determine `what portion of an interstate organism may appropriately be attributed to each of the various states in which it functions.' Nashville, C. & St. L. Ry. v. Browning, 310 U.S. 362, 365, 60 S.Ct. 968, 970, 84 L.Ed. 1254 [1255]. So far as due process is concerned the only question is whether the tax in practical operation has relation to opportunities, benefits, or protection conferred or afforded by the taxing state. See Wisconsin v. J. C. Penney Co., 311 U.S. 435, 444, 61 S.Ct. 246, 249, 85 L.Ed., 267 [270], 130 A.L.R. 1229. Those requirements are satisfied if the tax is fairly apportioned to the commerce carried on within the State.
"There is such an apportionment under the formula of the Pullman [Palace-Car Co. v. Com. of Pennsylvania, 141 U.S. 18, 11 S.Ct. 876, 35 L.Ed. 613] case. Moreover, that tax, like taxes on property, taxes on activities confined solely to the taxing State, or taxes on gross receipts apportioned to the business carried on there, has no cumulative effect caused by the interstate character of the business. Hence there is no risk of multiple taxation. Finally, there is no claim in this case that Louisiana's tax discriminates against interstate commerce. It seems therefore to square with our decisions holding that interstate commerce can be made to pay its way by bearing a nondiscriminatory share of the tax burden which each State may impose on the activities or property within its borders. See Western Live Stock v. Bureau of Revenue, 303 U.S. 250, 254, 255, 58 S.Ct. 546, 548, 82 L.Ed. 823 [826, 827], 115 A.L.R. 944, and cases cited. We can see no reason which should put water transportation on a different constitutional footing than other interstate enterprises."
As hereinbefore stated, the question before the Supreme Court of the United *14 States in the Ott case was whether the state of Louisiana and the city of New Orleans could levy ad valorem taxes based upon a mileage percentage figure. The appellant in the instant case contends that that decision has the effect of substituting a new formula for the long established rule of taxation whereby states, wherein the owners of watercraft are domiciled, can tax such boats to their full value as other personal property so owned is taxed. It is to be noted, however, that this conclusion must be reached by inference from the language used in the Ott case. It is not within the scope of the facts there presented or the decision rendered thereon.
Other recent decisions of the Supreme Court of the United States are more directly in point; cases in which that court recognized the right of the domiciliary state to levy the full ad valorem tax on personal property passing through other states in interstate commerce.
In the case of Northwest Airlines, Inc., v. State of Minnesota, 322 U.S. 292, 64 S.Ct. 950, 951, 88 L.Ed. 1283, the question presented was stated by Mr. Justice Frankfurter, as follows: "The question before us is whether the Commerce Clause or the Due Process Clause of the Fourteenth Amendment bars the State of Minnesota from enforcing the personal property tax it has laid on the entire fleet of airplanes owned by the petitioner and operated by it in interstate transportation. The answer involves the application of settled legal principles to the precise circumstances of this case. To these, about which there is no dispute, we turn."
The pertinent facts therein were as follows:
"Northwest Airlines is a Minnesota corporation and its principal place of business is St. Paul. It is a commercial airline carrying persons, property and mail on regular fixed routes, with due allowance for weather, predominantly within the territory comprising Illinois, Minnesota, North Dakota, Montana, Oregon, Wisconsin and Washington. For all the planes St. Paul is the home port registered with the Civil Aeronautics Authority, under whose certificate of convenience and necessity Northwest operates. At six of its scheduled cities, Northwest operates maintenance bases, but the work of rebuilding and overhauling the planes is done in St. Paul. Details as to stopovers, other runs, the location of flying crew bases and of the usual facilities for aircraft, have no bearing on our problem.
"The tax in controversy is for the year 1939. All of Northwest's planes were in Minnesota from time to time during that year. All were, however, continuously engaged in flying from State to State, except when laid up for repairs and overhauling for unidentified periods. On May 1, 1939, the time fixed by Minnesota for assessing personal property subject to its tax (Minn. Stat.1941, § 273.01), Northwest's scheduled route mileage in Minnesota was 14% of its total scheduled route mileage, and the scheduled plane mileage was 16% of that scheduled. It based its personal property tax return for 1939 on the number of planes in Minnesota on May 1, 1939. Thereupon the appropriate taxing authority of Minnesota assessed a tax against Northwest on the basis of the entire fleet coming into Minnesota. For that additional assessment this suit was brought. The Supreme Court of Minnesota, with three judges dissenting, affirmed the judgment of a lower court in favor of the State. [State v. Northwest Airlines, Inc.,] 213 Minn. 395, 7 N.W.2d 691. A new phase of an old problem led us to bring the case here. [Northwest Airlines, Inc., v. State of Minnesota,] 319 U.S. 734, 63 S.Ct. 1157, 87 L.Ed. 1695."
In holding that the state of Minnesota was authorized to levy a tax upon "all personal property of persons residing therein, including the property of corporations", the court reviewed its decisions in previous cases and held that the doctrine of tax apportionment for instrumentalities engaged in interstate commerce introduced in Pullman's Palace Car Co. v. Com. of Pennsylvania, 141 U.S. 18, 11 S.Ct. 876, 35 L.Ed. 613, was inapplicable. Relying on the case of People of State of New York ex rel. New York Central & Hudson River *15 Rd. Co. v. Miller, 202 U.S. 584, 26 S.Ct. 714, 50 L.Ed. 1155, the court stated: "Here, as in that case, a corporation is taxed for all its property within the State during the tax year none of which was `continuously without the state during the whole tax year.' * * * The fact that Northwest paid personal property taxes for the year 1939 upon `some proportion of its full value' of its airplane fleet in some other States does not abridge the power of taxation of Minnesota as the home State of the fleet in the circumstances of the present case."
It is to be noted that the Northwest Airlines case was mentioned in the opinion in the Ott case, but it was neither modified nor limited in any way. In its essential facts the Northwest Airlines case is similar to the instant case. It involved a tax by the domiciliary state whereas the Ott case involved the validity of a tax by a state other than the domiciliary state. We do not believe the Northwest Airlines case and the Ott case are in conflict. The Supreme Court of the United States applied the rule to the taxation of tangible personal property which it had theretofore applied to the taxation of intangible personal property, that is, that such property may be taxed both at its domiciliary situs and at the place where it had acquired a business situs.
It is pertinent to note that in the instant case we are not considering the taxation of the property of a public utility engaged in interstate transportation but rather the taxability of property of a domestic corporation which operated both within and beyond the limits of this state. Further, since the company here is not a public utility, there is no provision under the statutes of this state for the establishment of any mileage, barrel mileage, time period or other arbitrary classification, and this court is entirely without authority to select any apportionment method and adopt it as the correct applicable principle. That is purely a legislative function and, as hereinbefore stated, if the tax levied is unconstitutional it follows that there is no liability therefor whatever. The record does not disclose that any other state taxed these boats and barges, although there is an inference that Kentucky is now asserting its right to do so. We conclude that the levying of the tax in question was not violative of the Fourteenth Amendment of the Constitution.
We come now to the question of machinery and equipment in process of construction.
The company included no machinery in process of construction in its personal property tax returns for the years 1943, 1944, 1945 and 1946, claiming such property was not taxable. The Tax Commissioner, on audit for those years, found such machinery to be taxable and added to the assessment certificate for 1943 and 1944 the value, at book cost, of the unfinished Houdry catalytic cracking plant, assessed the machinery in each of those years at 50 per cent of cost and allowed a further reduction in book cost of 12 per cent, because he found that book cost exceeded the "true value" by such percentage.
The unfinished Houdry plant was the only machinery in process of construction involved in the 1943 and 1944 assessment, and the plant was completed by January 1, 1945. However, in the tax years 1945 and 1946, the company had other machinery, the bulk of which constituted an unfinished thermal gas plant located at Cleveland. The Tax Commissioner added these to the tax assessment certificate for the years 1945 and 1946, valuing them at 50 per cent of the book value.
The company contends that such machinery was not taxable in any of those years and that the Houdry plant should have been given a reduced valuation by reason of the excessive cost of construction on account of war emergency conditions existing at the time of the erection of that plant and of obsolescence.
The Tax Commissioner held that the machinery in process of construction was "used in business" within the definition of that term in Section 5325-1, General Code. The pertinent part of that section reads as follows: "Within the meaning of the term `used in business,' occurring in this title, personal property shall be considered to be `used' when employed or utilized in connection *16 with ordinary or special operations, when acquired or held as means or instruments for carrying on the business, when kept and maintained as a part of a plant capable of operation, whether actually in operation or not, or when stored or kept on hand as material, parts, products or merchandise * * *."
The Board of Tax Appeals held that the clause, "when kept and maintained as a part of a plant capable of operation, whether actually in operation or not," covers machinery in process of construction.
The company and the Tax Commissioner are in disagreement as to the meaning of the words, "kept," "maintained" and "part of a plant capable of operation," disclosing that the limited language used in this section in defining "used in business" requires our consideration.
It is the contention of the company that the words, "kept and maintained," as applied to the machinery herein, contemplate machinery completed and operative, since machinery is not maintained until it first has been completely constructed. The Tax Commissioner ascribes to the words a broader meaning which includes retaining possession of the machinery, and asserts that its retention and prevention of corrosion and other deterioration constitute "maintaining" within the definition of the term.
Much more divergence of view occurs when the parties hereto define the word, "plant." The company defines the word, "plant," as including only the Houdry catalytic cracking plant and the Thermal cracking plant and claims that, since each of these, of itself, was machinery in process of construction for the tax years in question, it necessarily could not be "part of a plant capable of operation," for it was not completed.
In the view of the Tax Commissioner the "plant" consisted of the entire operating refinery and included its many operating units among which were the Houdry catalytic cracking plant and the Thermal cracking plant, and consequently these units, even while under construction, were parts of a "plant capable of operation."
The Board of Tax Appeals, in construing Section 5625-1, General Code, supra, made the following observation: "It is to be observed however that the above noted provisions of Section 5325-1, General Code, were not enacted with special reference to either appellant's refineries at Cleveland or elsewhere or to petroleum refineries generally in this state. And in this view recognition must be given to the general definition that in an industrial or commercial sense, a `plant' includes real estate and all else that represents capital invested in the means of carrying on a business, exclusive of raw material or the manufactured product. This leads to the conclusion that as to the refinery property of the appellant each refinery as a whole at its location in Cleveland or elsewhere is `a plant' within the meaning of Section 5625-1, General Code. Inasmuch as each unfinished item or [sic] machinery and equipment here in question was a part of a refinery or `plant' capable of operation and in actual operation and was kept and maintained as such, it was property `used' and `used in business' within the meaning of the taxing statutes here under consideration."
In our view such application of Section 5625-1, General Code, is in accord with the well established rule that words of a statute, in common use or other than terms of art or science, will be construed in their ordinary acceptation and significance and with the meaning commonly attributed to them. Mutual Bldg. & Investment Co. v. Efros, 152 Ohio St. 369, 89 N.E.2d 648.
The following statement from 37 Ohio Jurisprudence, 546, Section 290, is pertinent: "Courts should be slow to impart any other than their natural and commonly understood meaning to terms employed in the framing of a statute. Too narrow a construction of terms is not favored. Statutory phraseology should not be given an unnatural, unusual, strained, arbitrary, forced, artificial, or remote meaning which may, in its last analysis, be technically correct but wholly at variance with the common understanding of men. A technical construction of words in common use is to be avoided."
*17 We hold that the decision of the Board of Tax Appeals that the Houdry catalytic cracking plant and the Thermal cracking plant, although under construction, constituted machinery "kept and maintained as a part of a plant capable of operation" was not unreasonable or unlawful.
Having determined that the Houdry plant, with other machinery, was subject to taxation while in the process of construction, the question directly presented is whether the valuation thereof by the commissioner, as corrected and modified by the Board of Tax Appeals, constituted the true value thereof.
The principal contention of the company as to assessed value relates to the Houdry catalytic cracking plant. That plant was a war project and was constructed to produce aviation gasoline much needed during the war, and because of the urgent need for and shortage of such fuel the company necessarily expended large sums of money in overtime wages and for required materials, with a result that the plant cost $2,419,102.-76 more to construct than the estimate furnished by the construction company. Both the company and the Tax Commissioner agree that the part of such "overrun," or excessive cost of construction, which did not add value to the property, should be eliminated from the assessed value thereof. The difference between the parties in that regard is primarily one of factthe company urging that the amount of "overrun" should be $1,423,852, whereas the Tax Commissioner held it to be $977,777.
On appeal, the Board of Tax Appeals fixed the amount of such excess costs at $1,200,000. The company contends that, on a percentage basis, the book value should be reduced by 15.64 per cent. The Board of Tax Appeals made this percentage 13.18 per cent of cost. These figures, of course, involve the value of the plant as completed but are likewise applicable to the plant when under construction in 1943 and 1944. These percentages were used by the Board of Tax Appeals, together with a depreciation allowance for the years it was used after completion, resulting in a valuation for tax year 1943 at $377,580, 1944, $5,399,459, 1945, $6,593,502 and 1946, $5,899,439.
The company contends that the figure arrived at by the Board of Tax Appeals not only failed to give sufficient allowance for the excess cost of construction or "overruns" but also made inadequate allowance for obsolescence of the Houdry catalytic cracking plant which it contends became partially obsolete at the termination of the war because the process of catalytic cracking had been replaced by more efficient methods.
The Houdry plant consisted of several units, which were a six-case unit, a three-case unit and foundations for another three-case unit which has never been constructed. The record discloses that the three-case unit was originally built as a special attachment to the six-case basic Houdry unit to assist the six-case unit in producing as large a quantity of high octane gasoline as possible during the war. Its function was to treat oil, which had been partly processed in the six-case unit, in such manner as to step up its octane rating for aviation purposes. That use terminated with the war, and the only use of the three-case unit during the year 1946 was in the manufacture of motor gasoline.
The record discloses that the three-case unit was inefficient in operation, not yielding as large a percentage of motor fuel from the oil processed as the larger regularly designed unit, resulting in a higher cost of operation.
The company claims that in the year 1946 it was entitled to a deduction from the value of this Houdry plant in the sum of $1,292.077 for obsolescence of the threecase unit and for the foundation of the three additional cases which were never built. The Board of Tax Appeals did regard the base for the additional cases as to some extent idle equipment and consequently reduced the value thereof from $135,000 to $13,500, but refused to allow any reduction by reason of the claimed obsolescence of the three-case unit. The board considered it as a part of the Houdry catalytic cracking plant as a whole and as an operating *18 unit thereof and applied to it the same rate of reduction for depreciation and overrun as were determined applicable to the remainder of the plant.
Evidence in the record supports the determination of the Board of Tax Appeals that the "overruns" totaled $1,200,000, and its decision in that respect was not unreasonable or unlawful. However, the refusal of the Board of Tax Appeals to make some allowance for obsolescence of the threecase unit was unreasonable and unlawful in that the Board of Tax Appeals failed to apply the principles established by this court in the case of B. F. Keith Columbus Co. v. Board of Revision of Franklin County, 148 Ohio St. 253, 74 N.E.2d 359. The syllabus of that case provides as follows:
"1. In determining the value of property for the purpose of taxation, the assessing body must take into consideration all factors which affect the value of the property.
"2. Functional depreciation occurs where property, although still in good physical condition, has become obsolete or useless due to changing business conditions and thus for all practical considerations is of little or no value to the owner of such property.
"3. Where the evidence shows that, due to a change of business conditions, property has become obsolete, it is unreasonable for the assessing body not to consider this factor of functional depreciation in arriving at the tax value."
The facts in regard to the limited use of this three-case unit were not in dispute and require some allowance for the disclosed obsolescence. The failure of the Board of Tax Appeals to make such determination renders their decision as to the value of the Houdry plant for the year 1946 unreasonable and unlawful and requires a reversal of the order in that regard and a remand to the board for the redetermination of the correct true value of such plant for the year 1946.
At the conclusion of the proceeding before the Board of Tax Appeals, an application for rehearing was filed by the company wherein it protested the failure of the board to reduce the value of the machinery and equipment in the full amount of the excess valuation theretofore determined by it.
For the year 1945 the company failed to file a claim for deduction from book value (form 902) for the taxable property of the company, as disclosed by its inter-county return, so that, when the machinery in process of construction (the thermal plant) was added to the return, the sum of all the property listed exceeded the book values originally returned in the inter-county tax return by the sum of $561,027.
When the Tax Commissioner determined that the excess cost of construction or "overrun" on the Houdry plant was $988,000, he allowed only the sum which the true valuations as determined exceeded the listed book values, or a reduction in the sum of $561,027. The company contends that since all such property was in Cuyahoga county wherein the true value of the property found exeeded the book value by the sum of $900,002, the latter sum should have been allowed.
However, the company having concededly paid taxes on a basis in excess of the book values of personal property in Cuyahoga county as stated in its inter-county tax return, the Board of Tax Appeals held that as to the year 1945 any question of reducing the assessed tax values below those on which the company had paid the tax was moot and should not be considered, and allowed no reduction.
The company contends that the payment of the tax on the higher basis shown by the return did not render the question involved moot, but on the contrary the reduction should have been allowed because the classified tax law permits the refund to a taxpayer of a tax he has already paid but which, on appeal, is held not to have been owed. That contention is based on the provisions of Section 5395, General Code, which provides in part as follows: "Excepting as to any taxable property concerning the assessment of which an appeal has been filed under section 5611 of the General Code, the tax commissioner may finally assess the taxable property required to be returned *19 by any taxpayer * * * for any prior year or years within the time limited therefor in section 5377 of the General Code * * *." (Emphasis supplied.)
The Board of Tax Appeals in its decision admits, in effect, that the taxpayer was entitled to a reduction in valuation in the sum of $900,002, but states, in effect, that, because the appeal was determined after the time for issuance of the final assessment certificate by the Tax Commissioner had expired and the tax had been paid, such reduction would be ineffective. The payment of the tax when due to avoid interest and penalties and when accompanied by a proper appeal protects all the taxpayer's rights until all administrative and judicial review thereof is completed.
Where a taxpayer is required by law to file an inter-county return he is not thereby precluded from claiming the rights of a taxpayer filing a return in a single county. Wright Aeronautical Corp. v. Glander, Tax Comm'r, 151 Ohio St. 29, 84 N.E.2d 483, distinguished.
The decision of the Board of Tax Appeals is not unreasonable or unlawful except as to its refusal to make proper allowance for obsolescence in the year 1946 and its refusal to grant the taxpayer proper reduction to book values for the year 1945 as above indicated.
The cause is accordingly remanded to the Board of Tax Appeals for further proceeding in acordance with this opinion.
Decision affirmed in part and reversed in part.
WEYGANDT, C. J., and ZIMMEMAN and HART, JJ., concur.
STEWART and TAFT, JJ., concur, except in paragraph two of the syllabus and the portion of the opinion relating thereto.
MIDDLETON, J., not participating.
TAFT, Judge (concurring).
I have considerable doubt about paragraph two of the syllabus. However, I reach the same result on another ground. The Houdry plant, even before it was "capable of operation," was at that time "acquired or held as means or instruments for carrying on the business" within the meaning of the words found in Section 5325, General Code. At that time, the Houdry plant might not be so "held" but it was so "acquired." The words "acquired or held" are in the disjunctive.
STEWART, J., concurs in the foregoing concurring opinion.