## NASHVILLE, CHATTANOOGA & ST. LOUIS RAILWAY *v.* BROWNING ET AL., CONSTITUTING THE STATE BOARD OF EQUALIZATION OF TENNESSEE.

No. 789.   Argued April 30, May 1, 1940.—Decided May 20, 1940.

*Mr. William H. Swiggart,* with whom *Mr. Edwin F. Hunt* was on the brief, for petitioner.

*Mr. W. F. Barry,* Assistant Attorney General of Tennessee, with whom *Messrs. Roy H. Beeler,* Attorney General, and *Dudley Porter, Jr.,* Assistant Attorney General, were on the brief, for respondents.

MR. JUSTICE FRANKFURTER delivered the opinion of the Court.

This case is here to review a judgment of the Supreme Court of Tennessee sustaining an assessment of petitioner's property, tangible and intangible, under that state's *ad valorem* tax law. All Tennessee property is subject to such a tax; but there are two schemes of procedure for making assessments, one for public service corporations and one for other taxpayers. As to ordinary property the task of valuation rests upon officials of the various counties. For public service corporations the assessments

must be made by the Railroad and Public Utilities Commission, which is commanded to ascertain the "actual cash value" of corporate property situated in Tennessee. Tennessee Code, § 1526. Since petitioner operates an interstate railroad, the value of its entire system and not merely of that portion within Tennessee had first to be ascertained. This the Commission estimated at $23,-996,604.14. From this figure was deducted the value of petitioner's "localized" property, that is, its terminal buildings, shops, and non-operating real estate. The remaining sum served as the base for calculating the value of what in the language of Tennessee law is called the utility's "distributable" property attributable to Tennessee, § 1528, which the Commission ascertained by taking the ratio which petitioner's mileage in Tennessee bears to its total mileage. This was found to be $12,925,944; and that is the amount of the assessment here in dispute. From this action by the Commission petitioner appealed, in accordance with the local statute, to the State Board of Equalization, respondent here. After hearing and by formal opinion, the Board confirmed the Commission's valuation.

In anticipation of a certification by the Board of its final assessment preliminary to the collection of taxes based upon it, the Railway brought an appropriate proceeding in the state courts to set aside what it claimed was the void "excess of the fair taxable value" of its property. This suit was dismissed by the trial court and its judgment was affirmed by the Supreme Court of Tennessee with two justices separately dissenting. 140 S. W. 2d 781. Because of petitioner's claim that the result below was inconsistent with decisions of this Court, we granted certiorari. 309 U. S. 651. The assessment was contested below on objections grounded in both state and federal constitutions. Here, of course, only federal questions are open. Petitioner claims that the challenged

assessment violates the Fourteenth Amendment in its guarantees of due process and the equal protection of the laws, and is offensive to the Commerce Clause.

We shall first consider the claim based on the historic implications of the Commerce Clause as a limitation upon the state's taxing power.  Petitioner argued that Tennessee has taxed values which are in truth outside its borders, thereby burdening that which the Commerce Clause has left free.  The guiding principles for adjustment of the state's right to secure its revenues and the nation's duty to protect interstate transportation are by this time well settled.  The problem to be solved is what portion of an interstate organism may appropriately be attributed to each of the various states in which it functions.  Basic to the accommodation of these conflicting state and national interests is realization that by its very nature the problem is incapable of precise and arithmetical solution.  In tapping these common sources of revenue a state cannot, we have held, use a fiscal formula, whatever may be its appearance of certitude, to project the taxing power of the state plainly beyond its borders.  *Wallace* v. *Hines,* 253 U. S. 66.  In the light of these principles, Tennessee has not overstepped its bounds.

In basing its apportionment on mileage, the Tennessee Commission adopted a familiar and frequently sanctioned formula.  *Pullman's Car Co.* v. *Pennsylvania,* 141 U. S. 18; *Maine* v. *Grand Trunk Ry. Co.,* 142 U. S. 217; *Pittsburgh, C., C. & St. L. Ry. Co.* v. *Backus,* 154 U. S. 421; *Branson* v. *Bush,* 251 U. S. 182.  See 2 Cooley on Taxation, pp. 1660–64.  Its asserted inapplicability to the particular situation is rested on petitioner's evidence as to the comparative revenue-producing capacity of its lines in and out of Tennessee.  But both the Commission and the Supreme Court of the state thought that this evidence, however weighty, was insufficient to displace the relevance of the formula.  In a matter where exactness is con-

cededly unobtainable and the feel of judgment so important a factor, we must be on guard lest unwittingly we displace the tax officials' judgment with our own. Certainly we cannot say that the combined judgment of Commission, Board, and state courts is baseless. Wherever the states' taxing authorities have been held to have intruded upon the protected domain of interstate commerce in their use of a mileage formula, the special circumstances of the particular situation, in the view which this Court took of them, precluded a defensible utilization of the mileage basis. *Union Tank Line Co.* v. *Wright,* 249 U. S. 275; *Wallace* v. *Hines, supra; Southern Ry. Co.* v. *Kentucky,* 274 U. S. 76. No such circumstances are here presented.

This brings us to the Company's claims under the Fourteenth Amendment. The Railway first asserts that it is a victim of such invidious discrimination in the administration of Tennessee's tax statutes as is proscribed by the guaranty of "the equal protection of the laws." The claim is founded upon the following circumstances. As we have already indicated, there are two separate modes for the assessment of property in Tennessee, each with its distinctive procedure. The property of public service corporations is assessed by the Commission; all other property by local officials. This broad classification, separating two very different types of property, has been reflected, according to petitioner's contention, by a corresponding difference in the bases of assessment. For more than forty years, so it was urged before the courts of Tennessee and later here, the county assessors have systematically valued property at far less than its true worth, while utility and railroad properties have been assessed by the Commission at full value.[1]

---

[1] For a history of Tennessee railroad taxation, see Brannen, Taxation in Tennessee, pp. 62 *et seq.;* Robison, Bob Taylor and the Agrarian Revolt in Tennessee, pp. 123 *et seq.*

This systematic differentiation, petitioner claims, has been continuous and state-wide in its operation; has been "repeatedly brought to the attention of the General Assembly of the State of Tennessee"; has been left uncorrected by that body; and until the present case, so far as we are informed, has been unchallenged. In support of its claim the Railway adduced official and unofficial reports as well as a volume of affidavits from local assessing officials in the counties through which its lines run—all to the effect that locally assessed property was undervalued. The issue of forbidden discrimination was thus squarely raised below. But the Tennessee Supreme Court did not deem petitioner's evidence sufficient to overcome the presumption that in the exercise of its reviewing function, the Board had equalized assessments in accordance with the command of state law. We should be reluctant on such a question to reject the state court's determination as without foundation, and there is not enough in the record to warrant its repudiation. At the bar of this Court petitioner proffered the minutes of the State Board of Equalization—not in the record— to show the absence of equalization. Considering the nature of the litigation, the vigor and ability with which it was contested before the Circuit Court of Davidson County, on motion for new trial there, on the original appeal to the Supreme Court of Tennessee and finally on petition for rehearing, it would indeed turn this Court into a board of tax review if we were now to receive evidence not offered in any of the tribunals below.

But were we to take judicial notice of that which these minutes were offered to show, and therefore to regard the ground taken by the state court as a strained evasion of the differentiation between utility property on the one hand and all the rest on the other, we should still find no denial of the equal protection of the laws. It must be emphasized that the Company makes no claim

that its property is singled out from among other public service corporations for discrimination. Its asserted grievance is common to the whole class. We must put to one side therefore all those cases relied on by the petitioner which invoked the Fourteenth Amendment against discriminations invidious to a particular taxpayer. *Raymond* v. *Chicago Traction Co.,* 207 U. S. 20; *Sunday Lake Iron Co.* v. *Wakefield,* 247 U. S. 350; *Sioux City Bridge* v. *Dakota County,* 260 U. S. 441; *Bohler* v. *Callaway,* 267 U. S. 479; *Cumberland Coal Co.* v. *Board,* 284 U. S. 23; *Iowa-Des Moines Bank* v. *Bennett,* 284 U. S. 239. All these cases are inapposite. None denied power to a state to apply different yardsticks to different classes of property. Equally irrelevant are those cases in which this Court, because of the nature of the litigation, was construing the uniformity clause of a state constitution, and was not applying the Fourteenth Amendment. *Greene* v. *Louisville & I. R. Co.,* 244 U. S. 499; *Louisville & N. R. Co.* v. *Greene,* 244 U. S. 522. This Court has previously had occasion to advert to the narrow and sometimes cramping provision of these state uniformity clauses, and has left no doubt that their inflexible restrictions upon the taxing powers of the state were not to be insinuated into that meritorious conception of equality which alone the Equal Protection Clause was designed to assure. See *Puget Sound Co.* v. *King County,* 264 U. S. 22, 27.

That the states may classify property for taxation; may set up different modes of assessment, valuation and collection; may tax some kinds of property at higher rates than others; and in making all these differentiations may treat railroads and other utilities with that separateness which their distinctive characteristics and functions in society make appropriate—these are among the commonplaces of taxation and of constitutional law. *Kentucky Railroad Tax Cases,* 115 U. S. 321; *Pacific Express*

*Co.* v. *Seibert,* 142 U. S. 339; *Florida Central & P. R. Co.* v. *Reynolds,* 183 U. S. 471; *Southern Ry. Co.* v. *Watts,* 260 U. S. 519; *Atlantic Coast Line* v. *Daughton,* 262 U. S. 413; *Rapid Transit Corp.* v. *New York,* 303 U. S. 573. Since, so far as the Federal Constitution is concerned, a state can put railroad property into one pigeonhole and other property into another, the only question relevant for us is whether the state has done so. If the discrimination of which the Railway complains had been formally written into the statutes of Tennessee, challenge to its constitutionality would be frivolous. If the state supreme court had construed the requirement of uniformity in the Tennessee Constitution so as to permit recognition of these diversities, no appeal could successfully be made to the Fourteenth Amendment. Here, according to petitioner's own claim, all the organs of the state are conforming to a practice, systematic, unbroken for more than forty years, and now questioned for the first time. It would be a narrow conception of jurisprudence to confine the notion of "laws" to what is found written on the statute books, and to disregard the gloss which life has written upon it. Settled state practice cannot supplant constitutional guarantees, but it can establish what is state law. The Equal Protection Clause did not write an empty formalism into the Constitution. Deeply embedded traditional ways of carrying out state policy, such as those of which petitioner complains, are often tougher and truer law than the dead words of the written text. Compare *Cariño* v. *Insular Government,* 212 U. S. 449, 459. And if the state supreme court chooses to cover up under a formal veneer of uniformity the established system of differentiation between two classes of property, an exposure of the fiction is not enough to establish its unconstitutionality. Fictions have played an important and sometimes fruitful part in the development of law; and the Equal Protection Clause is not a command of candor.

So we are of opinion that such a discrimination, not invidious but long-sanctioned and indeed conventional, would not be offensive to the Fourteenth Amendment simply because Tennessee had reached it by a circuitous road. It is not the Fourteenth Amendment's function to uproot systems of taxation inseparable from the state's tradition of fiscal administration and ingrained in the habits of its people.

Finally, the Railway claims that the valuation of its entire system, on the basis of which the Commission has measured Tennessee's shares, is so far in excess of "full cash value" as to offend the Due Process Clause. The details on which this claim is based are fully set forth in the opinions below and call only for summary treatment here. The argument basically derives from the fact that the Commission's valuation of petitioner's system was the same as that for the previous biennium, although numerous adverse economic factors are alleged to have greatly reduced the property's worth. But railroads, unlike farms and city lots and stocks and bonds, are not objects of exchange. The very notion of a "full cash value" for a railroad is in many respects artificial. See 1 Bonbright, The Valuation of Property, pp. 511–632. Whatever may be the pretenses of exactitude in determining such a "value," to claim for it "scientific" validity, is to employ the term in its loosest sense. Compare *Chicago, B. & Q. Ry. Co.* v. *Babcock,* 204 U. S. 585, 598. Thorough canvass by the state courts found no justification for upsetting the determination of the Commission, and we could scarcely find warrant in the record for doing so. But even assuming that there was an overassessment, constitutional invalidity would not follow. If the needs of a state require higher taxes, the Fourteenth Amendment certainly does not bar their imposition. The maintenance of higher assessment in the face of declining value is merely another way of achieving the same result.

*Great Northern Ry. Co.* v. *Weeks,* 297 U. S. 135, does not bar the way. That is the only case, and it was decided by a sharply divided Court, in which a non-discriminatory assessment was struck down simply because it was thought excessive. Plainly, therefore, the case must have rested upon considerations peculiar to its own facts. Those are not the facts now before us. We conclude, therefore, that the Commission's over-assessment of petitioner's property, if over-assessment there was, constitutes no deprivation of any right under the Federal Constitution.

*Affirmed.*