351 S.E.2d 404

**Katherine PRYOR, Huldah Daugherty and Doris Jarrett, for Themselves and Others Similarly Situated**

v.

**Glen B. GAINER.**

**No. 16745.**

Supreme Court of Appeals of West Virginia.

Nov. 26, 1986.

---

Larry Harless, Morgantown, for appellant.

Charlie Brown, Atty. Gen., Thomas N. Trent, Asst. Atty. Gen., Charleston, for appellee.

NEELY, Justice:

In June, 1985, three widows of West Virginia circuit court judges petitioned on behalf of themselves and others similarly situated for a writ of mandamus ordering the State Auditor, Glen B. Gainer, to make full payment of the widows' benefits provided in *W.Va.Code* 51–9–6b [1967]. The widows filed their suit in response to a notice from the Auditor that, effective 1 July 1985, he intended to reduce the amount of the widows' benefits in order to comply with restrictions imposed by *W.Va. Code* 51–9–6b [1967]. The statute in question provides a pension benefit equal to 40% of a judge's salary to the widow of a judge eligible for retirement. However, the statute restricts the pool of money available to pay all combined widows' benefits to the yearly contributions of active judges, plus interest. The statute further prohibits the use of funds from general revenue. Thus the statute creates an expectancy, but then proceeds to allow that expectancy to be defeated by actuarial accidents.

On 24 July 1985, this Court heard oral arguments. On 2 July 1985, we issued a

per curiam order that directed the Auditor: (1) to place into the widows' annuity fund all present and future contributions from judges' salaries and contributions made with respect to prior service under the Court's opinion in *In re Dostert*, 174 W.Va. 258, 324 S.E.2d 402 (1984); and (2) to place all of the judges' retirement funds as defined in *W.Va.Code* 51-9-2 [1949] in interest-bearing securities as authorized by *W.Va.Code* 51-9-3 [1949] and to pay the interest to the widows. The matter was then reset for further argument, and was submitted to the Court on briefs on 6 May 1986.

Before we issued a decision, however, the West Virginia Legislature passed a bill that, among other things, removed the restriction of widows' pensions to contributed funds. Enr. H.B. 211, 68th Leg., 1st Extraordinary Sess. The Governor vetoed this bill, but not because of its provisions regarding widows. Thus we must now grapple with an issue about which there are no bright-line rules. Nevertheless, we conclude that because the facts are so outrageous, it is appropriate to repair to the fountainhead of equity for an interim solution until the Legislature again takes action.

## I.

The legislature enacted the judges' retirement system, Chapter 51, Article 9, of the *W.Va.Code*, in 1949. The provision for widows' benefits was added in 1961. Since its amendment in 1967, the statute has read in relevant part:

> There shall be paid, from the fund created by *W.Va.Code* 51-9-2 [1949], an annuity to the widow of a judge, who, at death, is eligible for the retirement benefits provided by *W.Va.Code* §§ 51-9-6 [1972], 51-9-6a [1961], or 51-9-8 [1972], or who, at death, has served at least sixteen full years as a judge of any court of record of this State, and who dies, either while in office or after resignation or retirement from office pursuant to the

provisions of this article: Provided, however, that any annuity accruing under this section shall be paid from, and only from, the fund and the interest thereon, accumulated through the contributions of judges from whose salary deductions have been made, as herein provided, and no annuity accruing hereunder shall be paid from any public monies contributed to the judges' retirement fund by the State of West Virginia.

*W.Va.Code* 51-9-6b [1967]. *W.Va.Code* 51-4-9 [1981] provides for a contribution of six percent of salary by a participating judge to the judges' retirement system until he becomes eligible to receive benefits.

Our basic problem arises from the fact that the apparent clarity of the statutory grant and accompanying limitation has been confounded by the actions of the legislature over the course of the past several years. The parties submit that contributions by judges and accumulated interest have fallen short of the amount paid to widows for approximately the past ten years. In 1985, the contributions were approximately $150,000 less than the widows' pensions, and the Administrative Director of the Supreme Court of Appeals has budgeted over $300,000 to cover the shortfall in the current fiscal year.[1] Eligible widows of circuit court judges currently receive $20,000 per year, and widows of State Supreme Court justices, $22,000. If we enforce the statutory restriction, their pensions will drop to about $6,800 and $7,300 per year, respectively, or less.

Since 1977, the widows' benefits have been supplemented each year by appropriations from general revenue. Both the State Auditor and Legislative Auditor have repeatedly brought this inconsistency to the attention of legislative leaders, and both houses considered amendments to the widows' pension statute in 1984, 1985, and 1986.[2] Further, as noted above, the legislature passed an amendment in time to shore up the fund before its total depletion, but that bill was vetoed. Consequently, we

---

**1.** *See* S.B. 200, 68th Leg., 1st Reg.Sess., 1986 W.Va.Acts ——; Charleston Daily Mail, May 10, 1985, at 11A, col. 1.

**2.** See note 6 below and accompanying text.

conclude that the legislature's intent was to provide full benefits for the judges' widows. The vetoed H.B. 211 passed 9 September 1986 and the Governor's omission of any mention of the widow's provision from his veto message compel this conclusion.

## II.

■ We begin with a brief discussion of the Auditor's function—specifically whether the State Auditor has the right to raise the legality of the widows' benefits. The Auditor's duties in this regard are set out in Chapter 12, Article 3 of the *Code*. Section one provides:

> Every person claiming to receive money from the treasury of the State shall apply to the auditor for a warrant for same. The auditor shall thereupon examine the claim, and the vouchers, certificates and evidence, if any, offered in support thereof, and for so much thereof as he shall find to be justly due from the State, *if payment thereof be authorized by law,* and if there be an appropriation not exhausted or expired out of which it is properly payable, he shall issue his warrant on the treasurer, specifying to whom and on what account the money mentioned therein is to be paid, and to what appropriation the same is to be charged.

[emphasis supplied by the Court]. This section requires the Auditor to "examine the claim," and to pay only "so much thereof as he shall find to be justly due," and to pay only "if payment thereof be authorized by law." Thus, the Auditor does not perform a mere ministerial duty in allowing and rejecting claims. *See, e.g., Robinson v. LaFollette,* 46 W.Va. 565, 568, 33 S.E. 288, 289 (1899).

The Auditor is not, however, required to examine every requisition with a magnifying glass. *W.Va Code* 12–3–5 [1985] provides:

> When appropriation has been made by law, subject to the order or payable on the requisition of a particular officer, board, or person, the order or requisition in writing of such officer, board, or person shall be sufficient authority to the auditor to issue his warrant for the same or any part thereof.

The latter section protects the Auditor when the legislature has specifically entrusted the power to draw on an appropriation to an officer, board or person other than the State Auditor.

■ The budget bill for the current fiscal year included such an entrustment of judicial retirement funds:

> This appropriation [for the general judicial budget] shall be administered by the administrative director of the supreme court of appeals, who shall draw his requisitions for warrants in payment in the form of payrolls, making deductions therefrom as required by law for taxes and other items.

> The appropriation for Judges' Retirement System is to be transferred to the judges' retirement fund, in accordance with the law relating thereto *upon requisition of the administrative director of the supreme court of appeals.*

S.B. 200, 68th Leg.Reg.Sess., 1986 W.Va. Acts —— [emphasis supplied by the Court]. The appropriation for the judicial retirement fund thus falls within the protection afforded by *W.Va.Code* 12–3–5 [1985], and the requisition of the administrative director is sufficient authority for the Auditor to issue a warrant. It does not necessarily follow, however, that the Auditor must pay a requisition without question. Although entrusted to the administrative director, transfer of funds upon the administrative director's requisition must be "in accordance with the law relating [to the judges' retirement fund]." Where, as here, payment of a requisition would violate a statute that has not been held invalid, the State Auditor may withhold payment.

Thus, although there is an appropriation for the widows' benefits, *W.Va.Code* 51–9–6b [1967], as written, does not authorize an expenditure in excess of the active judges' contributions, plus interest. Due to the restriction, there is no statute authorizing the proposed expenditure for full widows' benefits. It was within the Auditor's dis-

cretion, therefore, to challenge the expenditure in this case.[3]

## III.

Having decided that the State Auditor has the right to question the legality of this expenditure, we proceed ·to the issue of whether the Auditor may continue to pay a portion of the widows' benefits from general revenue appropriations. But before turning to specific legal principles, it is valuable, to point out initially that the American legal system is just that—a system. Statutory law, common law, equity, and administrative law all blend to achieve a total structure designed to reflect some aggregate of our combined (and often conflicting) views of "justice."

In general, primitive law systems are characterized by hard and fast rules, while advanced law systems are characterized by flexibility. The world's two great secular law systems—namely, Roman law (on which much of modern equity is based), and English common law—are systems of principles rather than systems of rules. The difference between a system of principles and a system of rules is like the difference between an alphabetic script and a system of ideographs such as the Chinese.[4] Both Roman lawyers and common lawyers succeeded in designing comprehensive and infinitely adaptable legal systems because they could manipulate abstractions on a scale previously unknown. Furthermore, both Roman and common lawyers were willing to reject the logic of their own constructions when that logic conflicted with the demands of justice and reason. The case before us presents a situation where the application of a too narrow logic will work extreme hardship and unintended injustice.

Courts have long recognized that they have a duty to construe statutes in a way that will accomplish the intent of the legislature. If the literal meaning of a statute is inconsistent with the meaning or intent of the legislature, or would lead to perverse results, the words of the statute must be interpreted to reflect the intention of the legislature. *See generally Sutherland Statutory Construction* § 46.07 (4th ed. 1984). Although it must have been unforeseen by the legislature in 1961, the amount contributed by active judges, plus interest, now falls so far short of the widows' pension provided by the statute that the benefits are rendered a nullity. We cannot imagine that the legislature intended to codify such a malicious exercise in irony.

Convincing evidence for this surmise can be found in the fact that the legislature, over the course of several years, has appropriated money from general revenue to fund the widows' benefits, despite being notified repeatedly by the State Auditor and the Legislative Auditor that this practice was contrary to the statute. Our personal knowledge of legislative mechanics leads us to infer that this backhanded method of amending the limitation on widows' pensions was chosen because there was reluctance to open up the entire subject of judges' pensions.[5] In the event, even when an appropriate amendment was passed in the 1986 special session, the bill was vetoed by the governor because of other provisions in the bill—exactly the result the legislature had sought to avoid in

---

3. *Compare Foster v. Gainer,* 166 W.Va. 88, 272 S.E.2d 666 (1980) (Auditor cannot withhold payment of constitutionally mandated requisition for which legislature has appropriated special fund).

4. This observation was first made by Rudolph von Jhering in his monumental 19th century study of Roman law, *Geist des romischen Rechts* (Spirit of Roman Law, 1st ed. 1852–65), which regretfully has never been translated into English, although there is a French translation by O. de Meulenaere.

5. Amendments that would have deleted the statutory requirement that annuities paid to judges' widows· come only from judges' contributions were introduced in both the Senate and the House of Delegates in 1984, 1985, and 1986. S.B. 162, 68th Leg., Reg.Sess., 1986 S.J. ——; H.B. 1208, 68th Leg., Reg.Sess., 1986 J.H.Del. ——; S.B. 518, 67 Leg., Reg.Sess., 1985 S.J. 460; H.B. 2092, 67th Leg., Reg. Sess., 1985 J.H.Del. 865; S.B. 487, 66th Leg., Reg.Sess., 1984 S.J. 470; H.B. 1775, 66th Leg., Reg.Sess., 1984 J.H.De. 426.

earlier years by the narrow expedient of simply funding the widows' benefits.

The disparity between contributions and benefits has developed over time, and it is difficult to pinpoint the culprit. The Judicial Reorganization Amendment to the West Virginia *Constitution* of November, 1974, created a significant part of the current problem. *See W.Va. Const.* art. VIII. The amendment elevated many inferior court judges to the status of circuit judges, and elevated their salaries commensurately. The prior contributions of these new circuit judges were low compared to the pension benefits to which they and their widows are now entitled. We assume that the voters did not intend to have an impact on the amount of pensions payable to judges' widows when they passed the amendment, yet the amendment had the unexpected effect of making more people eligible for larger benefits from a pool of contributions that did not increase as quickly as the benefits.

Furthermore, when the judges' retirement plan was inaugurated in 1949, every judge was required to join the plan or else foreswear benefits under the plan forever. Ch. 34, sec. 5, *Acts of the Legislature*, Regular Session, 1949. In 1953 the legislature changed the structure of the plan to allow judges who had initially declined to contribute to elect to join by paying missed contributions with interest. Ch. 54, *Acts of the Legislature*, Regular Session, 1953. By this last act, the legislature simply augmented the funds now available to the widows. In February, 1961, the legislature passed Ch. 23, *Acts of the Legislature*, Regular Session, which permitted widows' benefits to be paid from accrued contributions in the judicial pension fund. Those accumulated funds were at the time substantial.

However, in March 1961 the legislature established the public employees retirement system (PERS) for public employees, Ch. 118, *Acts of the Legislature*, Regular Session. PERS allowed judges a retirement plan other than the judicial retirement plan. Many judges had prior state government service, and because under the original judicial retirement system a judge was required to serve 16 years (which meant he needed to be reelected at least once to qualify for benefits) many judges chose to join the public employees system until they had enough years of judicial service to acquire vested rights in the judicial plan, at which time they switched. But the effect of the PERS option—probably unbeknownst to the legislature—was to reduce substantially the pool of money available to widows. Of the 66 active judges and justices in the State today, only 36 participate in the judicial retirement system.

We note finally that, disregarding interest, it takes more than six participating judges to support the pension of each widow (6% contribution, compared to 40% pension). When the pension system was enacted, the legislature must have underestimated either the number or longevity of judges' widows. But obviously the legislature intended to provide judges' widows with a meaningful pension. Given the legislature's chivalrous conduct in funding the widows' pensions over the past 10 years, it would be perverse to conclude that the intent to grant benefits did not overshadow the intent to restrict expenditures.

## IV.

We are instructed in our decision today by the decision of the United States Supreme Court in *Nashville, Chattanooga & St. Louis Railway v. Browning,* 310 U.S. 362, 60 S.Ct. 968, 84 L.Ed. 1254 (1940). In *Nashville,* the State of Tennessee had for many years systematically assessed the property of railroads and other utilities at full cash value and all other property at less than full cash value, despite the fact that uniformity of taxation was *commanded* by the State Constitution. The supreme court held that, the Tennessee Constitutional provision notwithstanding, the practice of differential assessment *was the law* of the state within the meaning of the Equal Protection Clause of the Fourteenth Amendment. Writing for the Court, Mr. Justice Frankfurter held:

Here.... all the organs of the state are conforming to a practice, systematic, un-

broken for more than forty years, and now questioned for the first time. It would be a narrow conception of jurisprudence to confine the notion of "laws" to what is found written on the statute books, and to disregard the gloss which life has written upon it. ... Deeply embedded traditional ways of carrying out state policy ... are often tougher and truer law than the dead words of the written text.

*Id.* at 369, 60 S.Ct. at 972. If this general principle can be applied to a command in a state constitution by the highest court in the nation, there is every reason to apply it to the case before us now.

■ Our decision in this case rests heavily on a foundation of equity: to give the statute literal application today would be like springing a long laid trap. Elderly women and their now dead husbands reasonably relied on traditions of chivalrous conduct. No one expects cruelty from the legislature, and our legislature has done everything possible to avoid a cruel result. To the extent that cruelty appears to emerge from this total process it is simply because the widows' are caught in a crossfire of contending strangers.[6] Certainly the Governor intends the widows no cruelty, nor does the legislature. A fair reading of Mr. Justice Frankfurter's opinion in *Nashville, supra,* indicates that the proper rule is that when apparently vested rights have been acquired that a novel construction of a statute or the resurrection of an old statute long in disuse would destroy, courts should be reluctant to allow deviations from accepted norms of fair dealing. *See, e.g., Service Transp. Lines, Inc. v. Illinois Commerce Comm'r,* 77 Ill.App.3d

52, 32 Ill.Dec. 738, 740, 395 N.E.2d 1119, 1121 (1979); *Murray Hospital v. Angrove,* 92 Montana 101, 10 P.2d 577, 583–84 (1932).[7]

Many courts also have held that legislative appropriation following a construction by an administrative agency is evidence that the legislature intended to adopt the agency's interpretation. This is true especially when a particular construction has been called to the legislature's attention as possibly erroneous. *See generally Sutherland Statutory Construction* § 49.10 (4th ed. 1984). In *United States v. Two Tracts of Land,* 456 F.2d 264 (6th Cir.1972), for example, the court held that by regularly appropriating funds, Congress demonstrated its intent to adopt the construction given to a statute by the Tennessee Valley Authority.[8] In that case, Congress had voted funds for a particular project in several consecutive years, and legislative history disclosed that objections on the basis of an alleged lack of statutory authority had been made to congressional appropriations committees on several occasions. The TVA case is not strictly parallel to the case before us because there was no direct statutory *prohibition* governing the appropriations made in that case. Nevertheless, *Two Tracts, supra,* supports the proposition that a legislature may adopt an interpretation of a statute by appropriating money accordingly. We conclude that the same sort of "ratification by appropriation" has occurred with regard to payments to judges' widows.

## V.

Although the specific facts of the case before us are unique, nonetheless, the

---

**6.** *See, In re Dostert,* 174 W.Va. 258, 324 S.E.2d 402 (1984) and Governor Moore's veto message of H.B. 211, *supra* in text, which says in part:

It is essential that the shadows cast by these decisions [*In re Dostert, supra; Oakley v. Gainer,* 175 W.Va. 115, 331 S.E.2d 846 (1985) ] be dispelled and faith in our judicial systems be restored, and this will not be accomplished by this legislation. Therefore, I direct that the Judges' Retirement System continue to be operated as set forth by chapter 34, Acts of the Legislature, 1949, as amended, and will have an examination conducted of the legal recourse available to the citizens of West Virgi-

nia through the courts of the United States of America, should this directive be challenged.

**7.** This reasoning is analogous to the principle of estoppel, although promissory estoppel *per se* cannot be urged against the State when functioning in its governmental capacity. *See, e.g., Freeman v. Poling,* 175 W.Va. 814, 338 S.E.2d 415, 420–21 (1985).

**8.** *See also District of Columbia Fed'n of Civic Assns. v. Airis,* 391 F.2d 478 (D.C.Cir.1968) (ratification by appropriation not accepted in the absence of prior knowledge of specific disputed action).

problem of a statute that produces such absurd results that it has long been ignored is a recurring one. Thus, our problem today can be solved by the ancient authority of the Roman law. For although English common law is a creature of the English genius, English equity is firmly grounded in Roman law. The applicable, well established principle can be found in Book One of *The Digest of Justinian,* "De Legibus Senatusque Consultis Et Longa Constuetudine" 32, where the digest propounds the following:

> Inueterata consuetudo pro lege non immerito custoditur, et hoc est ius quod dicitur moribus constitutum. nam cum ipsae leges nulla alia ex causa nos teneant, quam quod iudicio populi receptae sunt, merito et ea, quae sine ullo scripto populus probauit, tenebunt omnes: nam quid interest suffragio populus uoluntatem suam declaret an rebus ipsis et factis? quare rectissime etiam illud receptum est, ut leges non solum suffragio legis latoris, sed etiam tacito consensu omnium per desuetudinem abrogentur.[9]

For our purposes here, it is notable that this rule of statutory construction was announced in the reign of Julian—a late time in the history of the empire when the dead hand of inapplicable, disused statutes must have been heavy.

■ When, therefore, the legislature provides by statute that an expenditure shall be paid from a special fund and not from general revenue, but nevertheless appropriates money from general revenue for that expenditure each year for several years, and the legislature is on notice that such appropriations are contrary to the letter of the law, the restriction of the expenditure may be held to have been deleted. This construction is especially compelling where, as here, innocent private parties have reasonably relied on custom and usage, so that applying the disused statute would work great injustice.

We, therefore, grant the writ prayed for, and order the State Auditor to continue to pay pension benefits to the widows in the amount specified in *W.Va.Code* 51–9–6b [1967], even when that amount exceeds the limit set out in the statute.[10]

Writ awarded.

---

**9.** This legal proposition translates as follows: Age-encrusted custom is not undeservedly cherished as having almost statutory force, and this is the kind of law which is said to be established by use and wont. For given that statutes themselves are binding upon us for no other reason than that they have been accepted by the judgment of the populace, certainly it is fitting that what the populace has approved without any writing shall be binding upon everyone. What does it matter whether the people declares its will by voting or by the very substance of its actions? Accordingly, it is absolutely right to accept the point that statutes may be repealed not only by vote of the legislature but also by the silent agreement of everyone expressed through desuetude.

**10.** The petitioners also request an award of costs and attorneys' fees. In this case, the Auditor has endeavored to perform his duties honestly and in good faith, attempting to adhere to what appeared to be a clear statutory mandate. The award sought is therefore denied. *See, e.g., Nelson v. West Virginia Public Employees Ins. Bd.,* 171 W.Va. 445, 300 S.E.2d 86, 91–92 (1982).