416 S.E.2d 720

**COMMITTEE ON LEGAL ETHICS OF THE WEST VIRGINIA STATE BAR, Complainant,**

v.

**Charles F. PRINTZ, Jr., Respondent.**

**No. 20665.**

Supreme Court of Appeals of West Virginia.

Submitted Jan. 14, 1992.

Decided March 23, 1992.

Rehearing Denied May 13, 1992.

Sherri D. Goodman, The West Virginia State Bar, Charleston, for complainant.

Franklin D. Cleckley, Morgantown, for respondent.

NEELY, Justice:

In this attorney disciplinary proceeding, the Committee on Legal Ethics of the West Virginia State Bar recommends that this Court publicly reprimand Charles F. Printz, Jr., for violation of Disciplinary Rule 7–105(A) of the *Code of Professional Responsibility* (1978)[1] for his role in negotiations between his father and an embezzler formerly employed by his father. After independently examining the record, we disagree with the Board's recommendations, and we find that the complaint against Mr. Printz should be dismissed.

## I.

In 1986, Charles F. Printz, Sr., owner of Kable Oil Company, audited company financial records and discovered that $200,000 was missing. Larry Kesecker, the manager of Kable Oil, admitted that he embezzled the money. Neither Mr. Printz nor Mr. Kesecker wanted this case to be prosecuted criminally because Mr. Printz and Mr. Kesecker had developed a close personal relationship and because a criminal prosecution would embarrass Kable Oil. Therefore, Mr. Kesecker, Mr. Printz and Charles F. Printz, Jr., the respondent (and son of Charles F. Printz, Sr.), entered negotiations for repayment of the embezzled money. As a result of these negotiations, the respondent prepared a written confession for Mr. Kesecker to sign, as well as an agreement by Mr. Kesecker to sell his house, motorcycle and other personal property, and to turn over the proceeds to Kable Oil.

After an in-depth audit of Kable Oil showed that the missing funds actually totalled $395,515, Mr. Kesecker agreed to continue working at Kable Oil until it was sold in December, 1986. Mr. Kesecker also agreed to allow his therapist to turn over to the respondent notes from counseling sessions in order to help the respondent find the missing funds. On 15 July 1987,

---

1. D.R. 7–105(A) of the *Code of Professional Responsibility* (1978) states:

   A lawyer shall not present, participate in presenting, or threaten to present criminal charges solely to obtain an advantage in a civil matter.

the respondent held a meeting at which Mr. Printz, Sr., Mr. Kesecker and Mr. Kesecker's father, Donald, were present. Although the parties dispute who called the meeting, the purpose of the meeting unquestionably was to determine if Donald Kesecker would cover the losses caused by his son. Donald Kesecker was unwilling to do so.

On 26 August 1987, the respondent sent Larry Kesecker a "final demand" letter. In this letter he gave Mr. Kesecker the choice of agreeing to a strict financial arrangement for repayment of the embezzled money or criminal prosection. On 2 September 1987, Mr. Kesecker responded with a letter accepting the financial arrangement set out by the respondent. However, after Mr. Kesecker retained a lawyer, negotiations broke down and, then, Mr. Printz, Sr. notified law enforcement authorities of the embezzlement. Mr. Kesecker pleaded guilty to embezzlement, was required to make restitution, and received five years probation.

## II.

■ The Committee contends that the respondent should be reprimanded publicly for violation of Disciplinary Rule 7–105(A) of the Code of Professional Responsibility (1978). Noting that "this is admittedly an unusual case," the Committee nevertheless finds Mr. Printz's actions worthy of the minimum sanction, a public reprimand. However, as we stated in Syllabus Point 3 of *Committee on Legal Ethics v. Blair*, 174 W.Va. 494, 327 S.E.2d 671 (1984):

This Court is the final arbiter of legal ethics problems and must make the ultimate decisions about public reprimands, suspensions or annulments of attorneys' licenses to practice law.

## III.

■ In 1989, West Virginia replaced the *Code of Professional Responsibility* with the *Rules of Professional Conduct.* The Committee is correct that the replacement of the *Code* by the *Rules* does not absolve lawyers' actions in 1987 from the ethical guidelines set forth in the *Code.* However,

we have taken into consideration the reasons for the omission of a counterpart to DR 7–105(A) in the new *Rules.* As stated by Professors Hazard and Hodes:

Rule 4.4 does *not* incorporate the prohibition originally found in DR 7–105(A) of the Code of Professional Responsibility, which provided that "a lawyer shall not present, participate in presenting, or threaten to present criminal charges solely to obtain an advantage in a civil matter." Nor does this prohibition appear elsewhere in the Rules of Professional Conduct; *it was deliberately omitted as redundant or overbroad or both.*

The ethical ban on threatening criminal prosecution is redundant because in some jurisdictions it covers much the same ground as the crimes of extortion and compounding crime, and Rule 8.4 makes it a disciplinary offense for a lawyer to commit such crimes....

Of course in many jurisdictions (and in the Model Penal Code), even overt threats are not criminally punishable if they are based on a claim of right, or if there is an honest belief that the charges are well founded. In those jurisdictions, the lawyer's actions could be a crime only if the lawyer sought more of the other party's property than he believed his client was entitled to. With respect to compounding crime, many jurisdictions excuse the victims of crime who seek restitution in exchange for an agreement not to report.

But these exceptions only point toward the second defect of rules like DR 7–105(A): *they are overbroad because they prohibit legitimate pressure tactics and negotiation strategies.* DR 7–105(A) evidently meant to push beyond extortion and compounding crime, but without any coherent limit.

In reality, many situations arise in which a lawyer's communications on behalf of a client cannot avoid addressing conduct by another party that is both criminal and tortious. Inevitably, the question of which remedial routes will be taken must also be addressed. An example is where a lawyer for a financial

corporation must deal with an employee who has been discovered in embezzlement. In general, the client corporation is interested in recovering as much of its money as possible, and there is also a public interest in enforcement of the criminal law. These interests are not always compatible, however, for it may well be in the interest of the company to have the employee pay back the money and quietly resign, without the adverse publicity that a criminal trial would bring to the corporation as well as to the employee. Lurking near the surface is [sic] this calculus can be uncertainty about whether the employee's crime can be proved beyond a reasonable doubt, and the risk that the employee might sue for wrongful discharge or defamation if the employer does file a criminal accusation.

In these circumstances it is counterproductive to prohibit the lawyer from discussing with the employee, or the employee's counsel, the possibilities noted above. *Indeed, competent representation would seem to require the lawyer to press ahead with such full-ranging negotiations.* Yet, so long as DR 7–105(A) was on the books, the lawyer had to worry whether she would commit professional misconduct if she even mentioned these possibilities. Indeed, the situation can degenerate into implicit or even explicit blackmail *against the lawyer,* to pressure the lawyer into recommending to her client that criminal prosecution not even be considered or discussed. Faced with such restrictions (even without the added factor of blackmail), some lawyers might simply avoid the issue, while others might resort to code words and euphemisms. In either event, the client corporation in the example could be seriously disserved. [Footnotes omitted.] [Emphasis added.]

Hazard and Hodes, *The Law of Lawyering, A Handbook on the Model Rules of Professional Conduct,* § 4.4:103 (Prentice Hall Law & Business 1990).

We find this reasoning persuasive. The rules of legal ethics should not prohibit lawyers from engaging in otherwise legitimate negotiations. However, there are

limits as Rule 4.4 of the *West Virginia Rules of Professional Conduct* [1989] provides the appropriate standards to guide a lawyer's conduct in these matters. Rule 4.4 states:

> In representing a client, a lawyer shall not use means that have no substantial purpose other than to embarrass, delay, or burden a third person, or use methods of obtaining evidence that violate the legal rights of such a person.

All parties to this case might have been served better if the negotiations had continued and a prosecution had never ensued. However, this finding does not exonerate Mr. Printz completely. It exonerates him *only* if his actions were *otherwise legitimate.*

## IV.

*W.Va.Code,* 61–5–19 [1923] provides:

> If any person, knowing of the commission of an offense, take any money, or reward, or an engagement therefor, upon an agreement or undertaking, expressed or implied, to compound or conceal such offense, or not to prosecute therefor, or not to give evidence thereof, he shall, if such offense be a felony, be guilty of a misdemeanor, and, upon conviction, be confined in jail not more than one year and fined not exceeding five hundred dollars; and if such offense be not a felony, unless it be punishable merely by a forfeiture to him, he may be confined in jail not more than six months, and shall be fined not exceeding one hundred dollars.

The history of *W.Va.Code,* 61–5–19 [1923], can be traced at least as far back as the Statute of 18 Elizabeth, Chapter 5, which states, in pertinent part:

> And be it further enacted, That no such informer or plaintiff shall or may compound or agree with any person or persons that shall offend, or shall be surmised to offend, against any penal statute, for such offence committed, or pretended to be committed, but after answer made in court into the information or suit in that behalf exhibited or prosecuted. . . .

The purpose of this statute was to discourage "the making of improper exactions, and not to punish persons by whom such awards are paid." *Aikman v. Wheeling,* 120 W.Va. 46, 50, 195 S.E. 667, 669 (1938).

*W.Va.Code,* 61–5–19 [1923], on its face prohibits offering not to prosecute a crime in exchange for the return of funds lost due to a crime. Thus, the respondent's actions in this case appear to violate *W.Va. Code,* 61–5–19 [1923].

## V.

*U.S. Const.,* Amend. XIV, Section 1, provides:

All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

The Due Process Clause requires that a person not be convicted under "a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application...." *Cline v. Frink Dairy Company,* 274 U.S. 445, 459, 47 S.Ct. 681, 685, 71 L.Ed. 1146 (1926) (citing *Connally v. General Construction Company,* 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926).) The United States Supreme Court has long held that convictions under vague statutes are inconsistent with the notions of fair play and a violation of due process under the Fifth and Fourteenth Amendments. *See, e.g., Papachristou v. City of Jacksonville,* 405 U.S. 156, 92 S.Ct. 839, 31 L.Ed.2d 110 (1972); *Lanzetta v. New Jersey,* 306 U.S. 451, 59 S.Ct. 618, 83 L.Ed. 888 (1939); *Cline v. Frink Dairy Company,* 274 U.S. 445, 47 S.Ct. 681, 71 L.Ed. 1146 (1927); *Connally v. General Construction Company,* 269 U.S. 385, 46 S.Ct. 126, 70 L.Ed. 322 (1926); *United States v. Cohen Grocery Company,* 255 U.S. 81, 41 S.Ct. 298, 65 L.Ed. 516 (1921).

■ Vague statutes violate due process *because they do not allow fair warning to those who are prosecuted under them.* Courts place limits on prosecutorial discretion for the same reasons. In *Yick Wo v. Hopkins,* 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886), the United States Supreme Court said:

When we consider the nature and the theory of our institutions of government, the principles upon which they are supposed to rest, and review the history of their development, we are constrained to conclude that they do not mean to leave room for the play and action of purely personal and arbitrary power.

*Id.* at 369–70, 6 S.Ct. at 1071.

■ Closely akin to the doctrine of "vagueness" stands the far less easily applied doctrine of "desuetude." Desuetude, like vagueness, is based on the concept of fairness embodied in the due process and equal protection clauses. Thus, a law prohibiting vagrancy is unfair because it is both broad and vague (*see Papachristou, supra*); similarly, a law prohibiting some act that has not given rise to a real prosecution in 20 years is unfair to the one person selectively prosecuted under it.

Although seldom used, desuetude is a widely accepted legal concept. As Professor Bork has said:

There is a problem with laws like these. They are kept in the code books as precatory statements, affirmations of moral principle. It is quite arguable that this is an improper use of law, most particularly of criminal law, that statutes should not be on the books if no one intends to enforce them. It has been suggested that if anyone tried to enforce a law that had moldered in disuse for many years, the statute should be declared void by reason of desuetude or that the defendant should go free because the law had not provided fair warning.

R. Bork, *The Tempting of America*, 96 (New York: The Free Press 1990).[2]

Desuetude is not, however, a concept nearly as new as Professor Bork's book. As we said in *Pryor v. Gainer*, 177 W.Va. 218, 225, 351 S.E.2d 404, 411 (1986):

> [T]he problem of a statute that produces such absurd results that it has long been ignored is a recurring one. Thus, our problem today can be solved by the ancient authority of the Roman law. For although English common law is a creature of the English genius, English equity is firmly grounded in Roman law. The applicable, well established principle can be found in Book One of *The Digest of Justinian*, "De Legibus Senatusque Consultis Et Longa Constuetudine" 32, where the digest propounds the following:
>
> > Inueterata consuetudo pro lege non immerito custoditur, et hoc est ius quod dicitur moribus constitutum. nam cum ipsae leges nulla alia ex causa nos teneant, quam quod iudicio populi receptae sunt, merito et ea, quae sine ullo scripto populus probauit, tenebunt omnes: nam quid interest suffragio populus uoluntatem suam declaret an rebus ipsis et factis? quare rectissime etiam illud receptum est, ut leges non solum suffragio legis latoris, sed etiam tacito consensu omnium per desuetudinem abrogentur.[3]

*See also* W. Shakespeare, *Measure for Measure*, Act II, scene II (1623) ("The law hath not been dead, though it hath slept.")

The United States Supreme Court has also recognized the concept of desuetude. In *Poe v. Ullman*, 367 U.S. 497, 81 S.Ct. 1752, 6 L.Ed.2d 989 (1961), the Supreme Court considered the Connecticut statute proscribing the use of contraceptives (later found unconstitutional in *Griswold v. Connecticut*, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965)). In *Poe*, the Court did not reach the constitutional question because the statute had not been enforced in years. Writing for the Court, Justice Frankfurter said:

> The Connecticut law prohibiting the use of contraceptives has been on the State's books since 1879. Conn.Acts 1879, c. 78. During the more than three-quarters of a century since its enactment, a prosecution for its violation seems never to have been initiated, save in *State v. Nelson*, 126 Conn. 412, 11 A.2d 856 [ (1940) ]. The circumstances of that case, decided in 1940, only prove the abstract character of what is before us. There, a test case was brought to determine the constitutionality of the Act as applied against two doctors and a nurse who had allegedly disseminated contraceptive information. After the Supreme Court of Error sustained the legislation on appeal from a demurrer to the information, the State moved to dismiss the information. Neither counsel nor our own researches have discovered any other attempt to enforce the prohibition of distribution or use of contraceptive devices by criminal process. The unreality of these law suits is illumined by another circumstance. We were advised by counsel for appellants that contraceptives are commonly and notoriously sold in Connecticut drug stores. Yet no prosecutions are recorded; and certainly such ubiquitous, open, public sales would more quickly invite the attention of en-

---

2. *See also* G. Calabresi, *A Common Law in the Age of Statutes* (Cambridge, Mass.: Harvard University Press 1982); A. Bonfield, "The Abrogation of Penal Statutes by Nonenforcement," 49 Iowa L.Rev. 389 (1963); *Cf*. L. and W. Rodgers, "Desuetude as a Defense," 52 Iowa L.Rev. 1 (1966).

3. This legal proposition translates as follows: Age-encrusted custom is not undeservedly cherished as having almost statutory force, and this is the kind of law which is said to be established by use and wont. For given that statutes themselves are binding upon us for no other reason than that they have been accepted by the judgment of the populace, certainly it is fitting that what the populace has approved without any writing shall be binding upon everyone. What does it matter whether the people declares its will by voting or by the very substance of its actions? Accordingly, it is absolutely right to accept the point that statutes may be repealed not only by vote of the legislature but also by the silent agreement of everyone expressed through desuetude.

forcement officials than the conduct in which the present appellants wish to engage—the giving of private medical advice by a doctor to his individual patients, and their private use of the devices prescribed. *The undeviating policy of nullification by Connecticut of its anti-contraceptive laws throughout all the long years that they have been on the statute books bespeaks more than prosecutorial paralysis.* What was said in another context is relevant here. "Deeply embedded traditional ways of carrying out state policy ..."—or not carrying it out—"are often tougher and truer law than the dead words of the written text." *Nashville, C. & St. L.R. Co. v. Browning,* 310 U.S. 362, 369, 60 S.Ct. 968, 972, 84 L.Ed. 1254 (1940). *Poe, supra,* 367 U.S. at 501–02, 81 S.Ct. at 1754–55 (footnotes omitted) (emphasis added).

### VI.

■ Desuetude is not, however, a judicial repeal provision that abrogates any criminal statute that has not been used in X years. Ultimately, we must judge each statute individually to determine if it is void due to desuetude. As the U.S. District Court for the Southern District of New York said in *United States v. Elliott,* 266 F.Supp. 318, 326 (1967):

We find little analytical aid in merely applying, or refusing to apply, the rubric of desuetude. The problem must be approached in terms of that fundamental fairness owed to the particular defendant that is the heart of due process.

In other words, does a defendant have fair notice that he may be prosecuted under a particular statute? To answer this question, we must consider three factors.

■ The first factor is the distinction between crimes that are *malum in se* and crimes that are *malum prohibitum.* Crimes that are *malum in se* will not lose their criminal character through desuetude, but crimes that are *malum prohibitum* may. For instance, if no one had been prosecuted under an obscure statute prohibiting ax murders since Lizzie Borden

was acquitted, we would still allow prosecution under that statute today. Even though no one has been prosecuted for an ax murder in 50 years, we all still understand that it is inappropriate to resort to garden tools to settle family quarrels. On the other hand, we might think it quite reasonable to approach the man who has embezzled the money that we have set aside for our children's education and offer not to prosecute him if he will return the money to us.

Second, there must be an open, notorious, and pervasive violation of the statute for a long period before desuetude will take hold. As Friedrich Carl von Savigny, the founder of the Historical School of Jurisprudence, described the basic foundations necessary for customary law to develop:

1. There must be a plurality of acts....

2. Uniform, uninterrupted acts; that is to say the custom is interrupted when among these acts others resting upon an opposite rule have come forth. This determination is beyond all doubt.

3. The acts must recur throughout a long period....

F. Savigny, *System of the Modern Roman Law,* Vol. I, 138 (William Holloway, trans., Madras, India: J. Higginbotham, 1867).

The final criterion that we may take from modern law is that there must be a conspicuous policy of nonenforcement, or as the U.S. Supreme Court described it in *Poe,* "[an] undeviating policy of nullification ... throughout all the long years that ... bespeaks more than prosecutorial paralysis." *Poe, supra,* 367 U.S. at 501, 81 S.Ct. at 1754. These criteria allow only those statutes whose enforcement would violate due process to die a desuetudinal death. Furthermore, the Legislature may revitalize any statute simply by repassing it.

### VII.

■ Examining the three criteria for desuetude set forth above, *W.Va.Code,* 61–5–19 [1923], to the extent that it prohibits a victim or his agent from seeking restitution

in lieu of a criminal prosecution, clearly fails due to desuetude. The crime is obviously *malum prohibitum* since it utterly defies both human nature and good sense.[4] We need look only to Professors Hazard and Hode's discussion of compounding as an accepted and acceptable legal strategy to find vindication for this proposition as well as the second criterion, namely open, notorious and pervasive violation of the statute. *See* Hazard and Hodes, *supra* at § 4.4:103. The last reported case of a prosecution under *W.Va.Code*, 61–5–19 [1923], was *Aikman, supra,* in 1938. Finally, we have found no reported case of a successful prosecution for compounding a felony or misprision of felony anywhere in the United States in the past 20 years.[5]

The Court of Appeals of Maryland considered the history of misprision as well as the decisions of other states in *Pope v. State,* 284 Md. 309, 396 A.2d 1054 (1979). The Maryland court noted that although misprision was an ancient common law offense in England, it fell into disuse for a period of over 400 years until it was resurrected in *H.L. Sykes v. Director of Public Prosecution,* [1961] 3 All.E.R. 33. Shortly after *Sykes,* however, misprision was replaced by a new crime of "withholding information" which did not punish an agreement not to prosecute in exchange for restitution. *Id.,* 396 A.2d at 1070. The Court of Appeals of Maryland, after exhaustive research, came to the conclusion that no one has been punished under a misprision or compounding statute for agreeing not to prosecute in exchange for restitution in modern times. As the court noted:

'[I]n the modern acceptation of the term, misprision of felony is almost if not exactly the same as that of an accessory after the fact' (p. 680). The utility of such an offence has not, however, been demonstrated: '... perhaps not a single case can be cited in which punishment for such connection with a felony has been inflicted in the U.S.'

*Id.* at 1071 (*quoting Glazebrook,* "How Long, Then, is the Arm of the Law To Be?, 25 *Mod.L.Rev.,* 301, 307, n. 51 (1962)).

▮ Accordingly, we find *W.Va.Code,* 61–5–19 [1923], to the extent that it prohibits a victim or his agent from seeking restitution in lieu of a criminal prosecution, void under the doctrine of desuetude. Seeking payment beyond restitution in exchange for foregoing a criminal prosecution or seeking any payments in exchange for not testifying at a criminal trial, however, are still clearly prohibited.

## VIII.

▮ Because DR 7–105(A) has proven to be unworkable and because Mr. Printz did not have fair notice that he might be subject to prosecution under *W.Va.Code,* 61–5–19 (1923)[6], we find that he did not act inappropriately. Accordingly, we dismiss the charges against Mr. Printz.

Charges Dismissed.

---

4. This does not mean that all compounding is only *malum prohibitum* or that compounding is no longer a prosecutable offense in West Virginia. Compounding that amounts to extortion is still prohibited by *W.Va.Code,* 61–2–13 [1923]. Extortion is clearly *malum in se.* Receiving repayment of money taken from a victim is not extortion; however, asking a higher price (i.e., "Give me my money back and $20,000 or I'll call the cops!") in return for the victim's silence is extortion.

5. One court did discipline a lawyer and suggested that he might be liable for misprision, but a careful review of the facts shows that he did not arrange for his client to receive a return of his stolen property, but instead arranged for his client to receive a payment in exchange for dropping criminal charges. *See In the Matter of Friedland,* 59 N.J. 209, 280 A.2d 183 (1971). *See also Dunaway v. State,* 561 P.2d 103 (Okl.Cr. 1977) (stating in *dicta* that threatening to prosecute under a bad check statute could sometimes be a violation of the Oklahoma compounding statute).

6. Mr. Printz is a lawyer who surely would not have left so blatant a paper trail if he believed he was doing anything wrong. More importantly, a reasonable person in Mr. Printz's shoes, would not have believed that he was opening himself up to prosecution.