GARTH, J.,
dissenting:
I cannot agree with the majority of the panel which has reversed the district court’s order of October 11, 1996, and has held: (1) that we have subject matter jurisdiction to decide Wheeling’s claim against the Commonwealth; (2) that accordingly, we need not reach the issue of the Eleventh Amendment immunity of the individual Commissioners; and (3) that the assessment of construction and maintenance costs made against Wheeling is not a tax and does not discriminate against Wheeling in violation of 49 U.S.C.A § 11501 et seq. (West 1997) (“the 4-R Act”).
Because I believe that the majority has erred in its constitutional analysis as well as in the result which it reaches, I would affirm the district court’s order.[1] In doing so, I would hold that under the doctrine of Ex Parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), all future maintenance costs can be enjoined. I leave to the court for future decision, however, the question as to whether relief is available for assessed, but unpaid, construction costs.
I have come to this conclusion because I find no Congressional power under the Fourteenth Amendment to abrogate the sovereign immunity of the Commonwealth of Pennsylvania. Hence, as to the Commonwealth, we have no jurisdiction to entertain Wheeling’s challenge. However, as pertains to the individual Commissioners, their action in assess *98 ing Wheeling constitutes—under my analysis and the precedents I cite—a discriminatory tax.
Thus, I conclude that maintenance costs accruing in the future can be enjoined. I leave open for another day the question as to whether an unpaid assessment can be enjoined without violating the Eleventh Amendment.
I.
As the majority has explained, the Eleventh Amendment to the United States Constitution confers sovereign immunity upon the States. Without its explicit consent, a State cannot be sued in federal court unless Congress has abrogated its immunity. To abrogate the States’ sovereign immunity, Congress must (1) unequivocally express its intent to abrogate that immunity, and (2) act pursuant to a valid exercise of power. Seminole Tribe v. Florida, 517 U.S. 44, 55-56, 116 S.Ct. 1114, 1123, 134 L.Ed.2d 252 (1996). At this point, I depart from the majority’s analysis which upholds jurisdiction over the 4-R Act as enforcing the Equal Protection Clause because I cannot conclude that Congress could abrogate Pennsylvania’s sovereign immunity by recourse to the Fourteenth Amendment.
I agree with the majority that the 4-R Act was enacted pursuant to Congress’ commerce powers, and thus, after Seminole Tribe, abrogation of the States’ sovereign immunity can no longer be upheld on that basis. See Majority Op. at 92. I further agree that we may venture beyond the expressed intent of Congress to determine whether the 4-R Act could have been enacted pursuant to some other valid exercise of Congressional power such that we may still retain jurisdiction over claims against the States. See id. at 93. However, I conclude that there is no such power granted under the Constitution and hence I cannot agree that Congress could have validly enacted the 4-R Act pursuant to section five, the enforcement provision of the Equal Protection Clause of the Fourteenth Amendment.
The 4-R Act explicitly prohibits conduct by State and local authorities which “unreasonably burden[s] and discriminate^] against interstate commerce____” 49 U.S.C.A. § 11501. The purpose of the 4-R Act was to “provide the means to rehabilitate and maintain the physical facilities, improve the operations and structure, and restore the financial stability of the railway system of the United States.” Burlington Northern R.R. Co. v. Oklahoma Tax Comm’n, 481 U.S. 454, 457, 107 S.Ct. 1855, 1857-58, 95 L.Ed.2d 404 (1987). The policy behind the 4-R Act, memorialized at 49 U.S.C.A. § 10101 (West 1997), describes the commercial and economic objectives aimed at unburdening interstate commerce by strengthening the rail transport infrastructure of this country through competition and the free market. It is only with respect to the realization of these economic aims which proscribe predatory pricing, that any mention is made of prohibiting discrimination.[2]
Unlike the majority, I cannot conclude that Congress can validly invoke its enforcement powers under section five of the Fourteenth Amendment merely because the word “discrimination” appears within the statutory text. The Congressional enforcement power under section five is not unlimited. See City of Boerne v. Flores, — U.S.-,-, 117 S.Ct. 2157, 2163, 138 L.Ed.2d 624 (1997).[3] Enactments legislated pursuant to Congress’ section five enforcement power must be remedial in nature, designed to prevent constitutional infraction. See id.
*99 In Wilson-Jones v. Caviness, 99 F.3d 203 (6th Cir.1996), a pre-Flores case, the Sixth Circuit addressed whether acts legislated pursuant to Congress’ commerce powers can be upheld as legitimately enforcing the Equal Protection Clause under section five of the Fourteenth Amendment after Seminole Tribe. The court concluded that legislation enforcing the Equal Protection Clause only extends to that “class of persons that Fourteenth Amendment jurisprudence has already identified as deserving special protection.” Id. at 210. In light of Flores, the Sixth Circuit’s holding in Wilson-Jones properly recognized that enactments construed as enforcing the Equal Protection clause must remedy or prevent constitutional infringements.
Similarly, in CSX Transportation v. Board of Public Works, 138 F.3d 537 (4th Cir.1998), a post-Fiores opinion, the Fourth Circuit indicated that the district court held—as I would—that the 4-R Act could not be enacted under the section five power of the Fourteenth Amendment, as “the major purpose of the 4-R Act in general [is] to protect interstate commerce.” Id. at 540.[4] Accordingly, the district court dismissed a challenge by two railroads for the assessment of illegally assessed taxes under the 4-R Act for lack of subject matter jurisdiction in light of Seminole Tribe. [5]
By enacting the 4-R Act, Congress was not legislating to prevent unconstitutional behavior. There is no evidence that the discriminatory taxation which Congress intended to prohibit under the 4-R Act ever rose to the level of a constitutional violation such that the railroads were deprived of their right to equal protection. See, e.g., Nashville Chattanooga & St. Louis Ry. v. Browning, 310 U.S. 362, 60 S.Ct. 968, 84 L.Ed. 1254 (1940) (holding that higher tax burden placed upon railroad property did not violate the Equal Protection Clause). Without such evidence, we have no basis to conclude that Congress had the power to enact the 4-R Act pursuant to its enforcement power under the Fourteenth Amendment. See Flores, — U.S. at-, 117 S.Ct. at 2169.
Thus, although the court in Wilson-Jones opined in a footnote that its conclusion might differ had “Congress made findings that a particular group needed legal protection to remedy some sort of invidious discrimination not addressed by federal precedent,” 99 F.3d at 210 n. 4, Congress has not made such findings in this case. Hence, the majority’s rejection of Wilson-Jones despite its reliance upon this footnote is ill-founded as a justification to uphold jurisdiction over the 4-R Act. See Majority Op. at 93. Nowhere in the 4-R Act can a Congressional expression be found that the 4-R Act was passed “to secure the rights under the Fourteenth Amendment.” Katzenbach v. Morgan, 384 U.S. 641, 652, 86 S.Ct. 1717, 1724, 16 L.Ed.2d 828 (1966).
In fact, the majority implicitly concedes this point by reference to the following passage from Alabama Great Southern Railroad Company v. Eagerton, 663 F.2d 1036 (11th Cir.1981):
Until this law was passed ... states could constitutionally classify railroads differently from all other taxpayers for the impositions of state taxes without violating the equal protection clausefsic] of the Fourteenth Amendment. It was the obvious purpose of Congress: to put an end to this practice, where such treatment of the railroads as a class was discriminatory in effect.
Id. at 1040 (emphasis added); see Majority Op. at 93. Thus, the majority acknowledges that prior to the passage' of the 4-R Act disparate classifications concerning railroads for taxation purposes were constitutional and did not violate the Equal Protection Clause. Indeed, this was well-settled law. See Browning, 310 U.S. at 369, 60 S.Ct. at 972 (“so far as the Federal Constitution is concerned, a state can put railroad property into one pigeonhole and other property into another ... ”). Nevertheless, the majority *100 now apparently characterizes such classifications as unconstitutional, sufficient to warrant congressional enactment of the 4-R Act under the Fourteenth Amendment Equal Protection Clause. From Flores, we learn that “Congress does not enforce a constitutional right by changing what the right is.” — U.S. at -, 117 S.Ct. at 2164. Congress cannot make constitutional classifications unconstitutional, even though it can make such classifications unlawful. That is precisely what the 4-R Act did: it prohibited long-standing constitutionally permissible discriminatory taxation practices. It did not—indeed, could not—make such discrimination unconstitutional.
Furthermore, the majority’s analysis regarding the “findings” that Congress made that could support the enactment of the instant legislation under the section five power is both flawed and untenable. The legislative history and judicial recognition referencing discrimination cannot transform what was admittedly a constitutionally permissible classification into an impermissible one. That railroads were “easy prey” which were subjected to higher rates of taxation than other taxable entities does not lead to the inescapable conclusion that the discrimination that the railroads suffered—the disparate classification for taxation purposes— rose to unconstitutional proportions. The majority has not pointed to any evidence that could support the conclusion that the disparate taxation to which railroads were subjected constituted a violation under the Equal Protection Clause, and as I have mentioned above, Congress made no explicit findings, as Flores instructs must be done. See Flores, — U.S. at -, 117 S.Ct. at 2169. The mere fact that the railroads were permissibly discriminated against for taxation purposes is insufficient. Disparate tax classifications concerning railroads were long-standing:
That the states may classify property for taxation; may set up different modes of assessment, valuation and collection; may tax some kinds of property at higher rates than others; and in making all these differentiations may treat railroads and other utilities with that separateness which their distinctive characteristics and functions in society make appropriate—these are among the commonplaces of taxation and of constitutional law.
Browning, 310 U.S. at 368, 60 S.Ct. at 972.
As no. constitutional infraction has been shown, there is no issue to address concerning whether the section five enforcement power can be employed to abrogate the States’ sovereign immunity. More importantly, as there is no constitutional violation to remedy, interpreting § 11501 as the majority has is out of proportion to its remedial objective. “There must be a congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end. Lacking such a connection, legislation may become substantive in operation and effect.” Flores, — U.S. at-, 117 S.Ct. at 2164. Quite simply, there can be no congruence between the injury sought to be prevented in this case and the sustaining of § 11501 under the Fourteenth Amendment section five enforcement power, because the injury involved in this case is simply not a constitutional injury.
Accordingly, after Seminole Tribe, and in the absence of any other legitimate constitutional grant of power, the Congressional intent to abrogate the States’ sovereign’immunity under the 4-R Act cannot be upheld as enacted pursuant to a valid exercise of power.[6] See also Mills v. State of Maine, 118 F.3d 37 (1st Cir.1997) (rejecting section five of the Fourteenth Amendment as a means to retain federal jurisdiction over FLSA claim against the State in post-Seminole Tribe context).
In addition to Flores, other recent holdings from our court also support my position that the 4-R Act cannot be upheld as a valid enactment pursuant to the section five enforcement power. See In re: Sacred Heart Hosp., 133 F.3d 237 (3d Cir.1998);[7] College *101 Sav. Bank v. Florida Prepaid Postsecondary Educ. Expense Bd., 131 F.3d 353 (3d Cir. 1997).[8] While I acknowledge that these eases do not concern railroads or the 4-R Act, they form the crux of the analysis which must obtain where an act legislated pursuant to some other congressional power, such as the commerce clause, is examined for whether it can be upheld as a valid enactment under the section five power.
The majority finds no incompatibility between its holding and the holdings of the aforementioned cases largely because of the different subject matters involved and “section 11501’s legislative history and judicially recognized anti-discrimination purpose.” Majority Op. at 94. In each of those cases, however, and contrary to the conclusion which the majority reaches, the respective courts held that such legislation could not be validly enacted pursuant to the section five power. Furthermore, as I have indicated above, the discrimination referenced in § 11501’s legislative history and by various courts does not, by itself, render the discrimination the 4—R Act intends to prevent unconstitutional discrimination subject to enforcement under the section five power of the Fourteenth Amendment. The majority’s view of the test for validity under section five of the Fourteenth Amendment is so permissive, “it is difficult to conceive of a principle that would limit congressional power.” Flores, — U.S. at-, 117 S.Ct. at 2168.
Thus, I cannot join the majority of this panel in holding that this court retains subject matter jurisdiction over Wheeling’s 4-R Act claims against the Commission. Notwithstanding that conclusion, Wheeling’s claim for prospective declaratory and injunctive relief still survives against the individual Commissioners under the doctrine of Ex Parte Young—a subject not addressed by the majority. See CSX Transp., Inc. v. Board of Public Works, 138 F.3d 537 (4th Cir.1998);[9] Majority Op. at 92 n.7.
II.
A.
The district court held that the assessment levied against Wheeling for three (3) percent of the construction costs and for fifteen (15) percent of the future maintenance costs of the bridge constituted not only a tax under 49 § 11501(b)(4),[10] but a discriminatory tax. *102 I discuss the discriminatory character of the tax in Section 11(B), infra.
A tax “raises money, contribute[s] to a general fund, and [is] spent for the benefit of the entire community.” San Juan Cellular Tel. Co. v. Public Serv. Comm’n, 967 F.2d 683, 685 (1st Cir.1992).- By contrast, a fee is imposed for regulatory purposes generally by an entity upon those who are subject to its regulation. When it is unclear whether an assessment is a tax or a fee, courts
emphasize the revenue’s ultimate use, asking whether it provides a general benefit to the public, of a sort often financed by a general tax, or whether it provides more narrow benefits to regulated companies or defrays the agency’s costs of regulation.
Id. (emphasis added). Support for this distinction between taxes and regulatory fees is found in the Head Money Cases, 112 U.S. 580, 5 S.Ct. 247, 28 L.Ed. 798 (1884), and Union Pacific Railroad Company v. Public Utility Commission, 899 F.2d 854 (9th Cir. 1990), another case brought under the 4-R Act.
In those cases, the courts reasoned that the assessments in question were used to finance the cost of the regulatory programs regulating the immigration and railroad industries, respectively. Therefore, the benefits from these regulatory programs did not inure to the publie-at-large but only to the regulated industries. Accordingly, they did not constitute taxes.
Thus, the majority’s reliance upon these cases as authority which would authorize the assessments made in the instant case is misplaced. Those eases do no more than hold that monies used for the benefit of the particular industry do not necessarily benefit the public in general, and thus cannot be deemed “taxes.”
Here, considering the ultimate use of the monies assessed by the Commission, I can only conclude—as did the district court—that the assessments in question are a tax which benefits the general public which uses the bridge. Unlike a regulatory fee which would provide specific benefits to Wheeling, the revenue from the instant' assessments was earmarked for a highway bridge that, once repaired, would provide a general benefit to the public at large.
It must be kept in mind that Wheeling’s tracks are not laid upon the bridge in question. Rather, Wheeling’s tracks run under the very bridge for which Wheeling has been assessed and for which it is required to pay future maintenance charges. Wheeling has been running its trains under the bridge throughout the duration of the period that the bridge has been closed.
In its amendment to the complaint before the Commission, Scott Township conceded that the construction and repair of the highway bridge was for the benefit of the general public, not the railroads. Scott Township alleged:
(4)(d) That the present design of the “Crooked Bridge” is dangerous and not conducive to meeting the needs of the Township and travelling [sic] public in the area.
(5)(e) That the bridge above [Wheeling] be replaced with one designed to meet the needs of the Township and travelling [sic] public:
Amend, to Compl. at 2-3 (emphasis added). These averments—made by Scott Township—are revealing. They disclose that the Township intended to repair the bridge (which as the record establishes, provides no benefit for Wheeling) not for the benefit of Wheeling but only for that of the general public.
The testimony of Patricia Wodnicki, the former manager/ secretary of Scott Township, supports this fact as well. At her deposition, Wodnicki testified that the bridge for which the assessment was imposed upon Wheeling had been closed by 1982. See Dep. Patricia Wodnicki at 7 (Dec. 11, 1995).[11] Notwithstanding that the bridge had been closed by 1982, there is no contention that *103 interference had been had with Wheeling’s railroad operations or that Wheeling’s operations had been interrupted or impacted upon as a result of the bridge’s condition. In fact, the Commission’s Administrative Law Judge found that:
If the highway is permanently closed, and the bridge demolished, [Wheeling’s] operations will not be affected. The proposed improvement will not result in any changes to [Wheeling’s] operations nor will it provide [Wheeling] with any additional revenues.
Findings of Fact and Conclusions of Law (May 27, 1994). Furthermore, the repair of the bridge does not implicate any regulatory program regulating Wheeling’s activities. Accordingly, because the assessment and maintenance charges benefit only the general public and not specifically Wheeling, I conclude that the assessment levied upon Wheeling constituted a tax.
I believe the majority’s reasoning which relies upon National Railroad Passenger Corporation v. Pennsylvania Public Utility Commission, 848 F.2d 436 (3d Cir.1988)(“Amirafc”), and SEPTA v. Pennsylvania Public Utility Commission, 826 F.Supp. 1506 (E.D.Pa.1993) (“SEPTA”), affd, 27 F.3d 558 (3d Cir.1994) (unpublished table decision), to identify when an assessment is a tax, is flawed.[12] Those cases arise in a context different from the context of this appeal. Both eases involve a Congressional statute which exempted the railroad from any “taxes or other fees” imposed by any state. No definition of “taxes” or “fees” was furnished in either court’s holding that a special assessment to pay for the construction and maintenance of identified bridges could not be charged against the railroads. Thus, their analyses cannot assist us in distinguishing between a tax which should be borne by the general public and a regulatory fee properly imposed upon a carrier, because the statutory framework of those two cases exempted the railroad from both taxes and fees. I therefore read these cases and their discussions and holdings to be inapposite.
B.
Because the majority has held that Scott Township’s assessment does not constitute a tax, it has not addressed the issue of whether the tax is discriminatory. To determine whether this tax discriminates against Wheeling under § 11501, we must compare the effect of the tax upon a certain “comparison class” of other taxpayers.
Our sister courts in Atchison, Topeka & Santa Fe Railway Company v. Arizona, 78 F.3d 438 (9th Cir.1996), and Kansas City Railway Company v. McNamara, 817 F.2d 368 (5th Cir.1987), have held that the comparison class to which a railroad such as Wheeling should be compared is that of “other commercial and industrial taxpayers.” 78 F.3d at 441, 817 F.2d at 375. The Commission argues that because it has only limited jurisdiction to assess costs to a small group of entities that it would be inappropriate to compare its assessment on Wheeling to a class of all commercial and industrial taxpayers. Although we have yet to decide this issue, and as I have pointed out, the majority has not addressed it, I believe that the approach adopted by our sister courts in Atchison and Kansas City provides a logical and sensible rule of law.
If the comparison class were only those entities which were also taxed by the Commission, there would seldom, if ever, be any finding of discriminatory taxation. In Kansas City the court explained that
[t]he only simple way to prevent tax discrimination against the railroads is to tie their tax fate to the fate of a large and local group of taxpayers. A large group of local taxpayers will have the political and economic power to protect itself against an unfair distribution of the tax burden.
817 F.2d at 375.
Given that I would adopt as the comparison class the group of commercial and industrial taxpayers, I must conclude that the tax *104 at issue against Wheeling is a discriminatory-tax. None of the parties disputes that industrial and commercial taxpayers were not subjected to the tax assessment for the repair and reconstruction! of the highway bridge. As a result, I would affirm the district court’s ruling of discrimination as well.
III.
Wheeling seeks both declaratory and injunctive relief. As I would hold that after the Supreme Court decided Seminole Tribe, this court no longer has subject matter jurisdiction over the 4~R Act to hear eases involving the Commission, I am obliged to address the issue of whether the individual Commissioners may be sued under the doctrine of Ex Parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). As I have noted, the majority has not dealt with this issue. See supra at 93.
The doctrine of Ex Parte Young permits suits against state officials acting in their official capacity—notwithstanding the States’ immunity under the Eleventh Amendment— if the suit seeks prospective declaratory and/or injunctive relief. It does not allow suits for retrospective relief. See Edelman v. Jordan, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974).
Wheeling has not yet paid the discriminatory taxes it was assessed regarding .the construction of the bridge. Wheeling thus contends that it is seeking prospective relief because the assessment would have to be paid in the future. In addition, Wheeling asserts that because the future maintenance costs have not yet been assessed, the relief it requests is prospective in nature. By contrast, the Commissioners claim that the Commission’s order assessing costs to Wheeling became final when Wheeling appealed the Commission’s order. The Commissioners argue that if this court were to grant Wheeling relief, we would have to hold the Commission’s order—a past act—invalid, and that such would be contrary to Eleventh Amendment doctrine.
The issue of prospectivity is a difficult one. I have no problem holding that Wheeling is entitled to the prospective declaratory and injunctive relief concerning the future maintenance costs. Although the tax liability has already been determined, the Commissioners have not yet assessed those taxes. Accordingly, this court would merely be enjoining the state actors from assessing future taxes, and that would fall comfortably within the Ex Parte Young doctrine.
With respect to the taxes assessed against Wheeling for the construction of the bridge, however, the prospectivity issue is less clear, and I am troubled by the Commission’s claim that there is no remedy or relief available to Wheeling for the construction assessment made against it, despite Wheeling’s consistent and continual challenge to that assessment as a discriminatory tax. ,
Since we have heard oral argument, the Fourth Circuit has directly addressed this issue in CSX Transportation, Inc. v. Board of Public Works, 138 F.3d 537 (4th Cir.1998). Upholding jurisdiction over state officials under the Ex Parte Young doctrine, the Fourth Circuit held that “[a]n injunction against the future collection of the illegal taxes, even those that already have been assessed, is prospective, and therefore available under the Ex parte Young [sic] doctrine.” Id. at 541 (emphasis added). “The point is that the future collection[of the taxes] is illegal.” Id. at 543. Thus, under CSX Transportation, it is within the power of the court to enjoin as prospective relief improperly assessed—though not yet paid—taxes.
As I am in dissent and my opinion on the issue of prospectivity is without precedential authority, I leave the resolution of this issue for another day. Nevertheless, I would be inclined to hold that Eleventh Amendment doctrine would permit relief where a mere assessment without payment of the charge has occurred—as it has here—and the Fourth Circuit has led the way by holding so in CSX Transportation.
IV.
In sum, I disagree with the majority’s opinion in its entirety.
I would hold that this court is without subject matter jurisdiction to hear suits against the Commission after Seminole *105 Tribe. Nonetheless, Wheeling would be entitled to prospective declaratory and injunctive relief under the doctrine of Ex Parte Young.
I would also hold that the assessment against Wheeling is a tax because it is for the general benefit of the public, and not for the narrow benefit of the railroad or to achieve some regulatory purpose.
I would further hold that the tax is discriminatory because the comparison class of commercial and industrial taxpayers was not assessed the tax for construction or future maintenance costs.
Finally, I would hold that Wheeling is entitled to prospective declaratory and injunctive relief from any assessment relating to the future maintenance costs of the bridge, although as I have indicated above, I do not decide at this time whether relief from the Commission’s order levying the cost of construction of the bridge to Wheeling constitutes prospective or retrospective relief.
I therefore respectfully dissent from the majority’s holdings.

. The issue of whether Eleventh Amendment sovereign immunity strips subject matter jurisdiction from the federal forum was not before the district court.

. Section 10101 states, in pertinent part:
In regulating the railroad industry, it is the policy of the United States Government— (12) to prohibit predatory pricing and practices, to avoid undue concentrations of market power, and to prohibit unlawful discrimination.
49 U.S.C.A. § 10101(12) (emphasis added).

. In Flores, the Supreme Court held that the Religious Freedom Restoration Act ("RFRA”) was unconstitutional because its enactment exceeded Congress’ enforcement power under section five of the Fourteenth Amendment. Instead of remedying or preventing constitutional infringements, the Court concluded that RFRA altered the meaning the Free Exercise Clause, thereby exceeding Congress’ legitimate exercise of its section five power.

. I have been unable to directly access the district court opinion, as it is unavailable on either Westlaw or Lexis.

. The Fourth Circuit reversed, however, on the basis that the district court had jurisdiction over State officials under the doctrine of Ex Parte Young. I discuss the Fourth Circuit’s opinion in CSX Transportation infra at 94 n.9, 97.

.' This, of course, does not mean that the statute, itself, is unconstitutional. Rather, it simply means that federal courts are without jurisdiction to adjudicate such claims against the States because the Eleventh Amendment proscribes them.

. In Sacred Heart, we addressed the constitutionality of § 106(a) of the Bankruptcy Code, 11 *101 U.S.C. § 106(a), which purports to abrogate state sovereign immunily in bankruptcy proceedings, in a post-Seminole Tribe context. As the Bankruptcy Clause is an Article I power, see U.S. Const, art. I, § 8, cl. 4, we held that it could not sustain an enactment abrogating a state’s sovereign immunity after Seminole Tribe. In considering whether § 106(a) could have been properly enacted pursuant to section five of the Fourteenth Amendment, we held that there was no evidence to support such a construction. Accordingly, we concluded that § 106(a) was unconstitutional as it was not enacted pursuant to a legitimate exercise of Congressional power.

. In College Savings Bank, we considered whether the district court properly dismissed a claim against the State of Florida brought under the Trademark Remedy Clarification Act of 1992 ("TRCA”) for want of subject matter jurisdiction after Seminole Tribe. In affirming, we held that on the facts of that case jurisdiction could not be upheld pursuant to the section five power as a means to enforce the Due Process Clause of the Fourteenth Amendment as no protected property right was at issue.

. Like the case before us, CSX Transportation v. Board of Public Works, 138 F.3d 537 (4th Cir. 1998), involved a challenge by two railroads to a tax levied in violation of the 4-R Act. The district court dismissed the case for want of subject matter jurisdiction in light of Seminole Tribe, see supra at 90-91, but found no basis for jurisdiction over state officials under Ex Parte Young. While not addressing whether the 4-R Act could be properly enacted pursuant to the section five power of the Fourteenth Amendment, the Fourth Circuit reversed, holding that the members of the Board of Public Works could be enjoined from the collection of such illegal taxes under the doctrine of Ex Parte Young. Indeed, the Fourth Circuit resolved the issue of improperly assessed taxes not yet paid—an issue which I have pointed out but have left open for this court to decide at a later time. See infra at 97. Hence, the analysis of the Fourth Circuit adopted in CSX Transportation coincides with my own in this case.

.Section 11501(b)(4) states:
(b) The following acts jmreasonably burden and discriminate against interstate commerce, and a State, subdivision of a State, or authority acting for a State or subdivision of a State may not do any of them:

(4) Impose another tax that discriminates against a rail carrier providing transportation subject to the jurisdiction of the Board under this part.

*102 49 U.S.C.A. § 11501(b)(4) (West 1997).

. The Amendment to Complaint and excerpts from the deposition of Patricia Wodnicki were submitted to the court by a letter dated September 12, 1997, after oral argument, upon the request of the court.

. Significantly, two cases on which the majority relies and which I find inapposite held that under a Congressional exemption statute, railroads could not be assessed construction and maintenance costs. See National R.R. Passenger Corp. v. Pennsylvania Pub. Util. Comm'n, 848 F.2d 436 (3d Cir.1988); SEPTA v. Pennsylvania Pub. Util. Comm’n, 826 F.Supp. 1506 (E.D.Pa.1993).